UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION

| | |
|---|---|
| BOB ROBISON COMMERCIAL FLOORING, INC. §<br>§<br>Plaintiff §<br>§<br>v. §<br>§<br>RLI INSURANCE COMPANY §<br>§<br>Defendant. § | CIVIL ACTION NO. 3:22-cv-150-KGB |

**DEFENDANT'S STATEMENT OF MATERIAL FACTS
AND ANNEX TO MOTION FOR SUMMARY JUDGMENT**

Defendant, RLI Insurance Company ("RLI"), pursuant to Rule 56.1 of the Local Rules for the Eastern and Western Districts of Arkansas, respectfully submits as an Annex to its Motion for Summary Judgment the following Statement of Material Facts as to which RLI believes there is no genuine issue of fact to be tried.

1.      Plaintiff, Bob Robison Commercial Flooring, Inc., filed a Verified Complaint against RLI in the Circuit Court of Craighead County, Arkansas on May 18, 2022, seeking declaratory relief and alleging RLI breached an insurance contract issued to Plaintiff when it denied Plaintiff's claim for damage to a vinyl gym floor that Plaintiff was installing at the Trumann, Arkansas Middle School. (Doc 2).  RLI timely and properly removed the case to this Court based on diversity of citizenship jurisdiction. (Doc 1)

2.      RLI issued RLI Marine Policy ILM0303051 with Arkansas amendatory endorsements to Bob Robison Commercial Flooring, Inc. effective June 11, 2021, to June 11, 2022. (the "Policy").  A true and correct of the Policy is attached to **RLI MSJ 1**, the Declaration

of Anthony Hart dated June 7, 2023 (also referred to herein as the "Hart Decl."), as Exhibit Hart

1.[1]  The Installation Floater Coverage Reporting Form provides as follows:

> In this coverage form, the words "you" and "your" mean the persons or organizations named as the insured on the declarations and the words "we", "us", and "our" mean the company providing this coverage.
> . . .
> **PROPERTY COVERED**
>
> "We" cover only the following property and only to the extent the property is not otherwise excluded or subject to limitations.
> 1. **Coverage** – "We" cover direct physical loss or damage caused by a covered peril to:
>
>    **a.**  "your" materials, supplies, fixtures, machinery, or equipment; and
>    **b.**  Similar property of others that is in "your" care, custody, or control
>    while at "your" "jobsite" and that "you" are installing, constructing, or rigging as part of an "installation project".
>
> 2. **Coverage Limitation** – Except as provided under Supplemental Coverages - Business Personal Property, "we" only cover materials, supplies, machinery, fixtures, and equipment that will become a permanent part of "your" completed "installation project".
>
> 3. **We Do Not Cover** – "We" do not cover materials, supplies, fixtures, machinery, or equipment that "you" are not or will not be installing, constructing, or rigging.
>
> 4. **We Do not Pay** – "We" do not pay for any penalties for:
>
>    **a.**  noncompletion or late completion of an "installation project" in accordance with the provisions or conditions in the installation or construction contract; or
>
>    **b.**  noncompliance with any provisions or conditions in the installation or construction contract.
>
> 5. **Limit** – The most "we" will pay in any one occurrence for loss or damage to materials, supplies, machinery, fixtures, and equipment at any one "jobsite" is the Jobsite Limit indicated on the "schedule of coverages".
>
> . . . .
>
> **PERILS COVERED**

---

[1] The Exhibits to RLI's Motion for Summary Judgment are labeled "**RLI-MSJ 1**," which is the Declaration of Anthony Hart dated June 7, 2023, ("Hart Decl.") and its attached Exhibits Hart 1-4, and "**RLI-MSJ 2**" which consists of Excerpts from the Deposition of Bob Robison as Corporate Representative of Bob Robison Commercial Flooring, Inc., taken May 18, 2023 ("Plaintiff Dep.")  The Summary Judgment Exhibits are attached hereto and incorporated herein.

"We" cover risks of direct physical loss or damage unless the loss is limited or caused by a peril that is excluded.

**PERILS EXCLUDED**
. . . .
2.  "We" do not pay for loss or damage that is caused by or results from one or more of the following:

   . . .

   d.  **"Defects, Errors, Or Omissions In Property"** – "We" do not pay for loss or damage caused by or resulting from inherent defects, errors, or omissions in covered property (whether negligent or not) relating to:

       1) design or specifications;

       2) workmanship or construction; or

       3) repair, renovation, or remodeling.

       But if a defect, error or omission as described above results in a covered peril, "we" do cover the loss or damage caused by that covered peril.

*Id.* the Policy at 24, 29-31.

3.     On April 8, 2021, Plaintiff submitted a bid to general contractor Nabholz Construction Corporation to install a vinyl athletic floor and striping according to specifications in the gym of the Trumann, Arkansas Middle School.  Through change orders, the job was expanded to include the installation of flooring in a "back gym," and the painting of a "Wildcat" logo on the main gym floor.  RLI-MSJ 2, Plaintiff Dep. 55:20 to 56:9; and Plaintiff Dep. 53:17 to 54:9.

4.     Plaintiff concedes that Plaintiff contracted with Nabholz to provide an installed floor properly painted to the contract specifications. In other words, the Plaintiff's work product for the project was supposed to be the installed floors with proper painting and striping.  *Id.*; see also, Plaintiff Dep. 55:5-19, 61:5-16, and 84:23 to 86:2.

5.     Plaintiff subcontracted the painting portion of its work on the project to Robert Liles and Robert Liles Parking Lot Services ("Liles").   Liles was given specifications and drawings for the line striping before he began work on about November 29, 2021.  Plaintiff did

**STATEMENT OF MATERIAL FACTS**                                    **Page 3 of 6**

not supervise or inspect Liles' work while it was ongoing.  **RLI-MSJ 2**, Plaintiff Dep at 20:23 to 21:24.

6.        On December 9 and 10, 2021, Nabholz informed Plaintiff that it had "major problems" with the floor painting, including crooked lines, incorrect markings, misplacement of the three-point lines for the basketball surface, drips, smudges, "bleeding" where the lines were improperly masked prior to painting and the failure to complete the black painting.  **RLI-MSJ 2,** Plaintiff Dep.17:22 to 19:22, 26:3-24, and 39:24 to 40:7.

7.        At a meeting with Nabholz and the project architect on December 13, 2021, Plaintiff was informed that the gym floor was being rejected because the paint and markings did not meet specifications.  **RLI-MSJ 2**, Plaintiff Dep. 26:3-24, 38:3-24, and 55:5-19.  The rejection of the floor was due to the poor workmanship of Plaintiff's subcontractor, Liles, in applying the markings and paint.  *Id.*

8.        Because of the nature of the vinyl flooring, once primer and paint are applied, the paint cannot be removed and repainted.  For the floor to meet specifications, the flooring had to be removed, new flooring installed and then new lines and marking painted by a new subcontractor. **RLI-MSJ 2**, Plaintiff Dep. 27:4-13.  Plaintiff's ultimate cost for the removal and replacement of the non-compliant flooring was $134,188.95.  **RLI-MSJ 2**, Plaintiff Dep. 74:4-12.

9.        Other than Liles' improper application of the painting there was no other or separate damage or peril to the floor.  **RLI-MSJ 2**, Plaintiff Dep. 14:17-25, 36:7-13, 38:8-24, 55:4-19 and 84:23 to 86:2.  The only reason the floor was rejected and had to torn out was because it did not meet specifications, and that was due to the workmanship of Plaintiff's subcontractor, Mr. Liles. *Id*, Plaintiff Dep. 55:13-19.  The loss to the floor was "just a failure of the workmen to do the job the way they were supposed to do it."  **RLI-MSJ 2**, Plaintiff Dep. 79:23 to 80:11.

**STATEMENT OF MATERIAL FACTS**                                          **Page 4 of 6**

10.    The RLI Policy was not a warranty for the work Plaintiff performs.  **RLI-MSJ 2**, Plaintiff Dep. 53:3-16.

11.    On January 24, 2022, after submitting the loss to Liles' liability insurance carrier and having the claim denied, Plaintiff, through its broker, Cashion Company, Inc., submitted a Proof of Loss (the "Claim") to RLI relating to the replacement of the Trumann gym flooring.  RLI-MSJ 2, Hart Decl. and Exhibit Hart-2.

12.    After an investigation and consideration of the Policy, RLI denied the Plaintiff's Claim on February 22, 2022, for the reasons stated in the denial letter.  RLI-MSJ 1, Hart Decl and Exhibit Hart 3.

13.    After Plaintiff's counsel requested reconsideration (Hart Decl. and Exhibit Hart 4) and RLI's counsel responded (Hart Decl. and Exhibit Hart 5), this lawsuit ensued.

Respectfully submitted,

*/s/ Jim Hunter Birch*

GREG K. WINSLETT
Admitted Pro Hac Vice
Texas State Bar No. 21781900
JIM HUNTER BIRCH
Arkansas State Bar No. 82016
Texas State Bar No.  00797991
**QUILLING, SELANDER, LOWNDS,**
**WINSLETT & MOSER, P.C.**
2001 Bryan Street, Suite 1800
Dallas, Texas 75201
(214) 871-2100
(214) 871-2111 (Fax)
gwinslett@qslwm.com
jbirch@qslwm.com

and

MICHAEL P. VANDERFORD
Ark. Bar. No. 93086
Senior Partner
ANDERSON MURPHY HOPKINS
101 River Bluff Drive
Suite A
Little Rock, AR 72202-2267
vanderford@ahmfirm.com

**ATTORNEYS FOR RLI INSURANCE COMPANY**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing instrument is being served upon all counsel of record in accordance with the Federal Rules of Civil Procedure on this 7th day of June 2023.

*/s/Jim Hunter Birch*
Jim Hunter Birch

**EXHIBIT**

# RLI-MSJ 1

**TO**

**DEFENDANT'S STATEMENT OF MATERIAL FACTS**

**AND ANNEX TO MOTION FOR SUMMARY JUDGMENT**

**(Declaration of Anthony Hart)**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION

BOB ROBISON COMMERCIAL FLOORING, §
INC.                                §
                                    §
            Plaintiff               §
                                    §        CIVIL ACTION NO. 3:22-cv-150-KGB
    v.                              §
                                    §
RLI INSURANCE COMPANY               §
                                    §
            Defendant.              §


### DECLARATION OF ANTHONY HART

STATE OF ILLINOIS       §
                        §
COUNTY OF PEORIA        §

My name is Anthony Hart. I am over the age of 21 years, and I am competent to make this declaration. I am a Senior Claims Examiner for RLI Insurance Company ("RLI").  I have personal knowledge of the facts stated herein based on my personal experience regarding the insurance claim related to the above captioned lawsuit, and they are all true and correct. As Senior Claims Examiner for RLI, I am a custodian of the records for RLI in connection with the claim related to the above captioned lawsuit. The records attached to this Declaration are made and kept in the ordinary course of business by employees of RLI, whose job it is to make and keep such records in the ordinary course of their work.

Attached hereto as **Exhibit Hart-1** is a true and correct copy of RLI Marine Policy No. ILM0303051, issued to the named insured Bob Robison Commercial Flooring, Inc., (the "Policy"). The Policy had effective dates of June 11, 2021, to June 11, 2022, and provided Installation Floater Coverage.

**DECLARATION OF ANTHONY HART**                                      **Page 1 of 3**

On January 24, 2022, Plaintiff's insurance broker, Erin Garner of the Cashion Company Insurance and Bonds, submitted a Property Loss Notice to RLI on behalf the Insured for damage to a vinyl gym floor that Bob Robison Commercial Flooring was installing at the Trumann, Arkansas Middle School with a reported date of loss of December 13, 2021. A true and correct copy of the Property Loss Notice is attached hereto as **Exhibit Hart-**2. The claim was assigned RLI Claim No. 00506309 (the "Claim"). The Claim was assigned to me on January 25, 2022, and I communicated with the broker that day to begin investigating the Claim. I had telephone and email communication with Bob Robison on January 27, 2022.

My investigation of the Claim included telephone interviews with Mr. Robison, review of the photographs provided by Mr. Robison and the broker, review of correspondence regarding the claim made by Robison under the liability insurance policy held by Robert Liles Parking Lot Services with Columbia Insurance Group, and review of the applicable Policy language.

Based upon my investigation, RLI concluded that the loss was not covered by the Policy since the damage to the flooring was caused by errors in workmanship committed by the Insured's painting subcontractor. On February 22, 2022, I signed and directed the Claims department to deliver by certified mail and email a letter to Bob Robison Commercial Flooring, Inc. denying the Claim based on the Policy exclusion identified in that letter.  A true and correct copy of the February 22, 2022, letter denying the Claim is attached to this Declaration as **Exhibit  Hart-3.**

On March 4, 2022, J.B. Cross of Newland Attorneys at Law submitted a request for reconsideration of the Claim on behalf of Bob Robison Commercial Flooring, Inc. A true and correct copy of the request for reconsideration, which was received by RLI's Claims Department on March 10, 2022, is attached hereto as **Exhibit Hart-4.**

**DECLARATION OF ANTHONY HART**                                       **Page 2 of 3**

On May 31, 2022, RLI's counsel responded to the request for reconsideration and confirmed that the loss was excluded under the Policy exclusion for loss resulting from errors in workmanship.  A true and correct copy of that response is attached hereto as **Exhibit Hart-5**.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: June 06 , 2023.

_Anthony Hart_
Anthony Hart

**DECLARATION OF ANTHONY HART**                                                    **Page 3 of 3**

# EXHIBIT HART-1

# CERTIFICATION

I, Scott R. Ostericher, do hereby certify that I am the AVP, Claim Operations of RLI Insurance Company, a corporation organized and existing under the laws of the State of Illinois, and that to the best of my knowledge the attached is a true and correct copy of Policy No. ILM0303051 (06/11/2021-06/11/2022) issued to Named Insured Bob Robinson Commercial Flooring, Inc.

Scott R. Ostericher
cn=Scott R. Ostericher, o=RLI/Mt. Hawley/CBIC, ou=Claim Department, email=Scott.Ostericher@rlicorp.com, c=US
To the best of my knowledge, the attached is a true and correct copy of this policy.
Peoria, Illinois
2022.06.08 08:51:38 -05'00'

Scott R. Ostericher, AVP, Claim Operations, Claims
RLI Insurance Company

RLI_000243



**RLI** **RLI Insurance Company**

9025 N. Lindbergh Drive • Peoria, IL 61615 • (309) 692-1000

A stock insurance company, herein called the Company.

# POLICY DECLARATIONS

Policy Number: ILM0303051        Broker Reference Number:

Renewal of:

**"NAMED INSURED" AND ADDRESS:**      **AGENT/BROKER:**

Bob Robison Commercial Flooring, Inc.

210 Karen Ct.                     57128   The Cashion Co Ins & Bonding

Jonesboro, AR 72401                         PO Box 550

                                         321 Scott Street

                                         Little Rock, AR 72203

**POLICY PERIOD** From   06/11/2021   To   06/11/2022   at 12:01 AM Standard Time at your mailing address shown above.

In consideration of the premium as outlined below and subject to all the terms of this Policy, this Company agrees to provide the insurance coverage as stated in the attached Policy. This premium may be subject to adjustment.

| Coverage Part | Premium |
|---|---|
| Installation Floater | $█████ |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

| See attached Tax, Fee & Surcharge Schedule (OMP 900) if applicable. | Taxes/Fees/Surcharges: N/A |
|---|---|
| **Premium payable at inception unless Payment Schedule (OMP 113) applies.** | **Total Premium:** $█████ |
| | **Minimum Premium:** $█████ |

**ADDITIONAL FORMS AND ENDORSEMENTS – MADE PART OF THIS POLICY AT TIME OF ISSUE**

See Attached Schedule of Endorsements (OMP 2150)

*Drew McKeon*

Authorized Signature

OMP 100 (07/09)               INSURED

Policy Number:   ILM0303051                                          RLI Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NAMED INSURED

The Insured named in the Policy Declaration Page is amended to read as follows:

Bob Robison Commercial Flooring, Inc.
Ralph Robison

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

OMP 666 (03/15)                                                      Page 1 of 1

RLI_000245

Policy Number: ILM0303051                                                                RLI Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# APPLICABLE FORMS & ENDORSEMENTS

FORMS AND ENDORSEMENTS LISTED BELOW APPLY TO AND ARE MADE PART OF THIS POLICY AT TIME OF ISSUE. IF LISTED UNDER A SPECIFIC SECTION, THE FORM APPLIES ONLY TO THAT SECTION AND DOES NOT CHANGE TERMS OR CONDITIONS FOR ANY OTHER SECTION. FORMS LISTED UNDER THE GENERAL SECTION APPLY TO ALL SECTIONS OF THE POLICY.

**General Section**

| | |
|---|---|
| OMP 666 (03/15) | Named Insured |
| OMP 113 (04/06) | Premium Payment Schedule |
| CPR 2230 (03/08) | Terrorism Exclusion |
| ILF 0001C (04/16) | Signature Page – Commercial Lines |

**Inland Marine Section**

| | |
|---|---|
| CL 0100 03 99 | Common Policy Conditions |
| CL 0700 10 06 | Virus or Bacteria Exclusion |
| IM 7106 01 12 | Schedule of Coverages – Installation Floater Coverage – Reporting Form |
| IM 7101 08 10 | Installation Floater Coverage – Reporting Form |
| IM 7115 08 10 | Testing and Commissioning Schedule Installation Floater |
| IM 7114 08 10 | Testing and Commissioning Coverage |
| IM 7120 08 10 | Contract Penalty Endorsement |
| CL 0811 09 18 | Cannabis Items And Activities Exclusion |
| CL 0178 11 01 | Amendatory Endorsement – Arkansas |
| IM 2007 07 20 | Amendatory Endorsement – Arkansas |

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

OMP 2150 (02/07)

INSURED

Policy Number: ILM0303051                                                    RLI Insurance Company

# PREMIUM PAYMENT SCHEDULE

The premium for this policy is payable in installments which are due and payable according to the following schedule:

| INSTALLMENT DUE DATE | PREMIUM AMOUNT DUE |
|---|---|
| Payments due per schedule | sent under separate cover |
| **Total Installment Premium:** | $███████ |

Any future endorsements or amendments to this policy that result in a change in premium may result in a revised schedule.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

OMP 113 (04/06)

INSURED

RLI_000247

Policy Number: ILM0303051                                                RLI Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TERRORISM EXCLUSION

1.  We will not pay for loss, damage, cost or expense caused directly or indirectly by "terrorism" including "certified acts of terrorism," as defined in the Terrorism Risk Insurance Act, as amended, unless specifically provided by endorsement to this policy or any action taken to control, prevent, or suppress terrorism. Such loss, damage, cost or expense is excluded regardless of any other cause or event that contributes concurrently or in any sequence to this loss.

2.  The following definition is added and applies under this endorsement wherever the term "terrorism" is used.

    "Terrorism" means activities against persons, organizations or property of any nature:

    A.  That involve the following or preparation for the following:

        1.  Use or threat of force or violence; or

        2.  Commission or threat of a dangerous act; or

        3.  Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

    B.  When one or both of the following applies:

        1.  The effect is to intimidate or coerce a government or the civilian population or any segment thereof, or to disrupt any segment of the economy; or

        2.  It appears that the intent is to intimidate or coerce a government, or to further polictical, ideological, religious, social or economic objectives or to express (or express opposition to) a philosophy or ideology.

3.  Fire Exception

    The following provision applies only where relevant state law requires coverage for fire losses resulting from acts of terrorism, and where a premium for such has been paid.

    If an act of terrorism results in fire, we will pay for the loss or damage caused by that fire. This exception for fire applies only to direct loss or damage by fire to covered property. This exception does not apply to coverage for business income, extra expense, or fire legal liability.

4.  Neither the terms of this endorsement nor the terms of any other terrorism endorsement attached to this policy provide coverage for any loss that would otherwise be excluded by this policy under:

    A.  Exclusions that address war, military action, or nuclear hazard; or

    B.  Any other exclusion.

5.  The absence of any other terrorism endorsement does not imply coverage for any loss that would otherwise be excluded by this policy under:

    A.  Exclusions that address war, military action, or nuclear hazard; or

    B.  Any other exclusion.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

CPR 2230 (03/08)                                                      Page 1 of 1

INSURED

RLI_000248

Policy Number: ILM0303051                                      RLI Insurance Company

**AAIS**
**CL 0100 03 99**
**Page 1 of 1**

# COMMON POLICY CONDITIONS

1. **Assignment –** This policy may not be assigned without "our" written consent.

2. **Cancellation –** "You" may cancel this policy by returning the policy to "us" or by giving "us" written notice and stating at what future date coverage is to stop.

    "We" may cancel this policy, or one or more of its parts, by written notice sent to "you" at "your" last mailing address known to "us". If notice of cancellation is mailed, proof of mailing will be sufficient proof of notice.

    If "we" cancel this policy for nonpayment of premium, "we" will give "you" notice at least ten days before the cancellation is effective. If "we" cancel this policy for any other reason, "we" will give "you" notice at least 30 days in advance of cancellation. The notice will state the time that the cancellation is to take effect.

    "Your" return premium, if any, will be calculated according to "our" rules. It will be refunded to "you" with the cancellation notice or within a reasonable time. Payment or tender of the unearned premium is not a condition of cancellation.

3. **Change, Modification, or Waiver of Policy Terms –** A waiver or change of the "terms" of this policy must be issued by "us" in writing to be valid.

4. **Inspections –** "We" have the right, but are not obligated, to inspect "your" property and operations at any time. This inspection may be made by "us" or may be made on "our" behalf. An inspection or its resulting advice or report does not warrant that "your" property or operations are safe, healthful, or in compliance with laws, rules, or regulations. Inspections or reports are for "our" benefit only.

5. **Examination of Books and Records –** "We" may examine and audit "your" books and records that relate to this policy during the policy period and within three years after the policy has expired.

---

**CL 0100 03 99**

Copyright, American Association of Insurance Services, 1998
RLI_000249

Policy Number: ILM0303051                                                                    RLI Insurance Company

AAIS
CL 0700 10 06
Page 1 of 1

This endorsement changes
the policy
**– PLEASE READ THIS CAREFULLY –**

# VIRUS OR BACTERIA EXCLUSION

## DEFINITIONS

**Definitions Amended –**

When "fungus" is a defined "term", the definition of "fungus" is amended to delete reference to a bacterium.

When "fungus or related perils" is a defined "term", the definition of "fungus or related perils" is amended to delete reference to a bacterium.

## PERILS EXCLUDED

The additional exclusion set forth below applies to all coverages, coverage extensions, supplemental coverages, optional coverages, and endorsements that are provided by the policy to which this endorsement is attached, including, but not limited to, those that provide coverage for property, earnings, extra expense, or interruption by civil authority.

1. The following exclusion is added under Perils Excluded, item 1.:

   **Virus or Bacteria –**

   "We" do not pay for loss, cost, or expense caused by, resulting from, or relating to any virus, bacterium, or other microorganism that causes disease, illness, or physical distress or that is capable of causing disease, illness, or physical distress.

This exclusion applies to, but is not limited to, any loss, cost, or expense as a result of:

a. any contamination by any virus, bacterium, or other microorganism; or

b. any denial of access to property because of any virus, bacterium, or other microorganism.

2. **Superseded Exclusions –** The Virus or Bacteria exclusion set forth by this endorsement supersedes the "terms" of any other exclusions referring to "pollutants" or to contamination with respect to any loss, cost, or expense caused by, resulting from, or relating to any virus, bacterium, or other microorganism that causes disease, illness, or physical distress or that is capable of causing disease, illness, or physical distress.

## OTHER CONDITIONS

**Other Terms Remain in Effect –**

The "terms" of this endorsement, whether or not applicable to any loss, cost, or expense, cannot be construed to provide coverage for a loss, cost, or expense that would otherwise be excluded under the policy to which this endorsement is attached.

CL 0700 10 06

Copyright, American Association of Insurance Services, Inc., 2006

INSURED

RLI_000250

**AAIS**
**IM 7106 01 12**
**Page 1 of 3**

# SCHEDULE OF COVERAGES

## INSTALLATION FLOATER COVERAGE
## REPORTING FORM

(The entries required to complete this schedule
will be shown below or on the "schedule of coverages".)

| PROPERTY COVERED | "Limit" |
|---|---|
| **Jobsite Limit** | $500,000 |
| **Catastrophe Limit** | $500,000 |

| COVERAGE EXTENSIONS | "Limit" |
|---|---|
| Additional Debris Removal Expenses | $5,000 |
| Emergency Removal | 10 days |
| Emergency Removal Expenses | $10,000 |
| Fraud and Deceit | $50,000 |
| Limited Fungus Removal | $15,000 |
| Waterborne Property | $50,000 |

**SUPPLEMENTAL COVERAGES**

| | |
|---|---|
| Business Personal Property | $10,000 |
| Expediting Expenses | $10,000 |
| Pollutant Cleanup and Removal | $10,000 |
| Rewards | $1,000 |
| Sewer Backup | $50,000 |
| Temporary Storage Locations | $250,000 |
| Transit | $250,000 |

Copyright, American Association of Insurance Services, Inc., 2012

INSURED

RLI_000251

**AAIS**
**IM 7106 01 12**
**Page 2 of 3**

---

**REPORTING CONDITIONS** (check one)

☒  Reporting Conditions waived

☐  Reporting Conditions applicable as described below:

   (check one)

   – Reporting Period     – Adjustment Period

   ☐  Monthly        ☐  Monthly

   ☐  Quarterly      ☐  Quarterly

   ☐  Annual         ☐  Annual

**Additional Premium Due After Expiration** – When the premium for the coverage provided by this policy is based upon reports of value, any additional premium owed to "us" is due on the due date that appears on the billing notice.

| Rate | Project/Installation |
|------|----------------------|
| _____ | _____ |
|         | _____ |
| _____ | _____ |
|         | _____ |
| _____ | _____ |
|         | _____ |

   – Premiums

     Deposit Premium         $_____

     Minimum Premium       $_____

**DEDUCTIBLE**

Deductible Amount           $ 1,000_____

Copyright, American Association of Insurance Services, Inc., 2012

INSURED

RLI_000252

**ADDITIONAL INFORMATION**

Reporting conditions waived.

Copyright, American Association of Insurance Services, Inc., 2012

INSURED

RLI_000253

RLI Insurance Company

**AAIS**
**IM 7101 08 10**
**Page 1 of 15**

# INSTALLATION FLOATER COVERAGE

## REPORTING FORM

In this coverage form, the words "you" and "your" mean the persons or organizations named as the insured on the declarations and the words "we", "us", and "our" mean the company providing this coverage.

Refer to the Definitions section at the end of this coverage form for additional words and phrases that have special meaning. These words and phrases are shown in quotation marks.

## AGREEMENT

In return for "your" payment of the required premium, "we" provide the coverage described herein subject to all the "terms" of the Installation Floater Coverage. This coverage is also subject to the "schedule of coverages" and additional policy conditions relating to assignment or transfer of rights or duties, cancellation, changes or modifications, inspections, and examination of books and records.

Endorsements and schedules may also apply. They are identified on the "schedule of coverages".

## PROPERTY COVERED

"We" cover only the following property and only to the extent the property is not otherwise excluded or subject to limitations.

1.  **Coverage** -- "We" cover direct physical loss or damage caused by a covered peril to:

    a.  "your" materials, supplies, fixtures, machinery, or equipment; and

    b.  similar property of others that is in "your" care, custody, or control

while at "your" "jobsite" and that "you" are installing, constructing, or rigging as part of an "installation project".

2.  **Coverage Limitation** -- Except as provided under Supplemental Coverages - Business Personal Property, "we" only cover materials, supplies, machinery, fixtures, and equipment that will become a permanent part of "your" completed "installation project".

3.  **We Do Not Cover** -- "We" do not cover materials, supplies, fixtures, machinery, or equipment that "you" are not or will not be installing, constructing, or rigging.

4.  **We Do Not Pay** -- "We" do not pay for any penalties for:

    a.  noncompletion or late completion of an "installation project" in accordance with the provisions or conditions in the installation or construction contract; or

    b.  noncompliance with any provisions or conditions in the installation or construction contract.

5.  **Limit** -- The most "we" pay in any one occurrence for loss or damage to materials, supplies, machinery, fixtures, and equipment at any one "jobsite" is the Jobsite Limit indicated on the "schedule of coverages".

## PROPERTY NOT COVERED

1.  **Airborne Property** -- "We" do not cover property while airborne except while in transit on a regularly scheduled airline flight.

2.  **Buildings, Structures, And Land** -- "We" do not cover buildings, structures, or land.

Copyright, American Association of Insurance Services, Inc., 2010

INSURED                                                                     RLI_000254

3. **Contraband** -- "We" do not cover contraband or property in the course of illegal transportation or trade.

4. **Machinery, Tools, Or Equipment** -- Except as provided under Supplemental Coverages - Business Personal Property, "we" do not cover machinery, tools, equipment, or similar property that will not become a permanent part of "your" "installation project".

5. **Trees, Shrubs, And Plants** -- "We" do not cover trees, shrubs, plants, or lawns.

6. **Waterborne Property** -- Except as provided under Coverage Extensions - Waterborne Property, "we" do not cover property while waterborne except while in transit in the custody of a carrier for hire.

---

## COVERAGE EXTENSIONS

---

**Provisions That Apply To Coverage Extensions** -- The following Coverage Extensions indicate an applicable "limit". This "limit" may also be shown on the "schedule of coverages".

If a different "limit" is indicated on the "schedule of coverages", that "limit" will apply instead of the "limit" shown below.

However, if no "limit" is indicated for a Coverage Extension within this coverage form, coverage is provided up to the full "limit" for the applicable covered property unless a different "limit" is indicated on the "schedule of coverages".

Unless otherwise indicated, the coverages provided below are part of and not in addition to the applicable "limit" for coverage described under Property Covered.

The "limit" provided under a Coverage Extension cannot be combined or added to the "limit" for any other Coverage Extension or Supplemental Coverage, including a Coverage Extension, Supplemental Coverage, or other coverage that is added to this policy by endorsement.

If coinsurance provisions are part of this policy, the following coverage extensions are not subject to and not considered in applying coinsurance conditions.

1. **Debris Removal** --

   a. **Coverage** -- "We" pay the cost of debris removal. Debris removal means the costs for the demolition, clearing, and removal of debris of covered property if such debris results from a covered peril.

   b. **We Do Not Cover** -- This coverage does not include costs to:

      1) extract "pollutants" from land or water; or

      2) remove, restore, or replace polluted land or water.

   c. **Limit** -- "We" do not pay any more under this coverage than 25% of the amount "we" pay for the direct physical loss or damage exclusive of the costs for debris removal. "We" will not pay more for loss to property and debris removal combined than the "limit" for the damaged property.

   d. **Additional Limit** -- "We" pay up to an additional $5,000 for debris removal expense when the debris removal expense exceeds 25% of the amount "we" pay for direct physical loss or when the loss to property and debris removal combined exceeds the "limit" for the damaged property.

   e. **You Must Report Your Expenses** -- "We" do not pay any expenses unless they are reported to "us" in writing within 180 days from the date of direct physical loss to covered property.

2. **Emergency Removal**

   a. **Coverage** -- "We" cover any direct physical loss or damage to covered property while it is being moved or being stored to prevent a loss caused by a covered peril.

   b. **Time Limitation** -- This coverage applies for up to ten days after the property is first moved. Also, this coverage does not extend past the date on which this policy expires.

3. **Emergency Removal Expenses** --

   a. **Coverage** -- "We" pay for "your" expenses to move or store covered property to prevent a loss caused by a covered peril.

Copyright, American Association of Insurance Services, Inc., 2010

INSURED

RLI_000255

b. **Time Limitation** -- This coverage applies for up to ten days after the property is first moved. Also, this coverage does not extend past the date on which this policy expires.

c. **Limit** -- The most "we" pay in any one occurrence for expenses to move or store covered property to prevent a loss is $10,000.

d. **This Is A Separate Limit** -- The "limit" for Emergency Removal Expenses is separate from, and not part of, the applicable "limit" for coverage described under Property Covered.

4. **Fraud And Deceit** --

a. **Coverage** -- "We" cover theft of covered property when "you", "your" agents, customers, or consignees are fraudulently induced to part with the covered property:

1) to persons who falsely represent themselves as the proper persons to receive the property;

2) by the acceptance of fraudulent bills of lading or shipping receipts; or

3) as a result of or directly related to the use of any electronic data processing hardware or software.

b. **Limit** -- The most "we" pay in any one occurrence for theft of covered property under this Coverage Extension is $50,000

5. **Limited Fungus Coverage** --

a. **Coverage** -- "We" pay for:

1) costs and expenses arising out of the presence of "fungus" on covered property caused by or resulting from a covered peril; and

2) direct physical loss or damage to covered property caused by or relating to the existence of or any activity of "fungus".

b. **Coverage Limitation** -- "We" only provide the coverage described in item 5.a. above:

1) when the "fungus" is the result of:

a) a "specified peril" other than fire or lightning; or

b) "flood" (if Flood Coverage is provided under this policy);

that occurs during the policy period; and

2) only if all reasonable steps were taken to protect the property from additional damage at and after the time of the occurrence.

c. **Limited Fungus Coverage Limit** -- The most "we" pay for all loss or damage covered by this Coverage Extension at all "jobsites" is $15,000, unless another "limit" is indicated on the "schedule of coverages". The Limited Fungus Coverage Limit applies regardless of the number of claims made, occurrences, or "jobsites".

The Limited Fungus Coverage Limit applies regardless of the number of "jobsites" or "installation projects" insured under this policy.

The Limited Fungus Coverage Limit is the most that "we" pay for the total of all loss or damage arising out of all occurrences of "specified perils", other than fire or lightning, or "flood" (if applicable) during each separate 12-month period beginning with the inception date of this policy.

d. **If The Policy Period Is Extended** -- If the policy period is extended for an additional period of less than 12 months, this additional period will be considered part of the preceding period for the purpose of determining the Limited Fungus Coverage Limit.

e. **Recurrence And Continuation Of Fungus** -- The Limited Fungus Coverage Limit is the most that "we" pay with respect to a specific occurrence of a loss that results in "fungus" even if such "fungus" recurs or continues to exist during this or any future policy period.

f. **Limited Fungus Coverage Limit Applies To Other Costs Or Expenses** -- The Limited Fungus Coverage Limit also applies to any cost or expense to:

1) clean up, contain, treat, detoxify, or neutralize "fungus" on covered property or remove "fungus" from covered property;

Copyright, American Association of Insurance Services, Inc., 2010

2)  remove and replace those parts of covered property necessary to gain access to "fungus"; and

3)  test for the existence or level of "fungus" prior to or following the repair, replacement, restoration, or removal of damaged property if it is reasonable to believe that "fungus" is present.

g.  **Loss Not Caused By Fungus** -- If there is a covered loss or damage to covered property not caused by "fungus", loss payment will not be limited by the "terms" of this coverage extension. However, to the extent that "fungus" causes an increase in the loss, that increase is subject to the "terms" of this Coverage Extension.

6.  **Waterborne Property** --

a.  **Coverage** -- "We" cover direct physical loss or damage caused by a covered peril to covered property while waterborne.

b.  **Limit** -- The most "we" pay in any one occurrence for loss or damage to covered property while waterborne is $10,000.

---

# SUPPLEMENTAL COVERAGES

---

**Provisions That Apply To Supplemental Coverages** -- The following Supplemental Coverages indicate an applicable "limit". This "limit" may also be shown on the "schedule of coverages".

If a different "limit" is indicated on the "schedule of coverages", that "limit" will apply instead of the "limit" shown below.

However, if no "limit" is indicated for a Supplemental Coverage within this coverage form, coverage is provided up to the full "limit" for the applicable covered property unless a different "limit" is indicated on the "schedule of coverages".

Unless otherwise indicated, a "limit" for a Supplemental Coverage provided below is separate from, and not part of, the applicable "limit" for coverage described under Property Covered.

The "limit" available for coverage described under a Supplemental Coverage:

a.  is the only "limit" available for the described coverage; and

b.  is not the sum of the "limit" indicated for a Supplemental Coverage and the "limit" for coverage described under Property Covered.

The "limit" provided under a Supplemental Coverage cannot be combined or added to the "limit" for any other Supplemental Coverage or Coverage Extension, including a Supplemental Coverage, Coverage Extension, or other coverage that is added to this policy by endorsement.

If coinsurance provisions are part of this policy, the following Supplemental Coverages are not subject to and not considered in applying coinsurance conditions.

1.  **Business Personal Property** --

a.  **Coverage** -- "We" cover direct physical loss or damage caused by a covered peril to business personal property that will not become a permanent part of a covered "installation project".

b.  **Coverage Limitation** -- "We" only cover business personal property while at "your" "jobsite".

c.  **Limit** -- The most "we" pay in any one occurrence for loss or damage to business personal property is $10,000.

2.  **Expediting Expenses** --

a.  **Coverage** -- When a covered peril occurs to a covered "installation project", "we" pay for reasonable expediting expenses necessary to complete installation, construction, or rigging by the date that installation, construction, or rigging would have been completed had the covered property not been lost or damaged.

Expediting expenses include, but are not limited to, additional:

1)  labor or overtime;

2)  transportation costs and storage expense;

3)  expense to rent additional equipment; and

4)  similar installation or construction expenses.

Copyright, American Association of Insurance Services, Inc., 2010

RLI_000257

b. **Limit** -- The most "we" pay in any one occurrence for all expediting expenses is $10,000.

3. **Pollutant Cleanup And Removal** --

a. **Coverage** -- "We" pay "your" expense to extract "pollutants" from land or water if the discharge, dispersal, seepage, migration, release, or escape of the "pollutants" is caused by a covered peril that occurs during the policy period.

b. **Time Limitation** -- The expenses to extract "pollutants" are paid only if they are reported to "us" in writing within 180 days from the date the covered peril occurs.

c. **We Do Not Cover** -- "We" do not pay the cost of testing, evaluating, observing, or recording the existence, level, or effects of "pollutants".

However, "we" pay the cost of testing that is necessary for the extraction of "pollutants" from land or water.

d. **Limit** -- The most "we" pay for each location is $10,000 for the sum of all such expenses arising out of a covered peril occurring during each separate 12-month period of this policy.

4. **Rewards** --

a. **Coverage** --

1) "We" pay a reward to an eligible person for information leading to the arrest and conviction of any person or persons committing arson, theft, or vandalism to covered property. The conviction must involve covered loss or damage to covered property caused by arson, theft, or vandalism.

2) "We" pay a reward to an eligible person for the return of stolen covered property when the loss is caused by theft.

b. **Eligible Person Means** -- An eligible person under this Supplemental Coverage means the first person to voluntarily provide the applicable law enforcement agency with the necessary information leading to the arrest and conviction or return of the stolen covered property.

An eligible person cannot be:

1) "you" or any family member;

2) "your" employee or any of his or her family members;

3) an employee of the applicable law enforcement agency;

4) any person who had custody of the covered property at the time the property was stolen; or

5) any person involved in the crime.

c. **Coverage Limitation** -- There will be no reward payment unless and until the person(s) committing the crime is (are) convicted, or the stolen covered property is returned.

d. **Limit** -- The most "we" pay as a reward in any one occurrence under this Supplemental Coverage is $1,000.

The amount "we" pay is not increased by the number of persons involved in providing the information.

5. **Sewer Backup** --

a. **Coverage** -- "We" cover direct physical loss or damage to covered property caused by or resulting from:

1) water or waterborne material that backs up, overflows or is otherwise discharged through a sewer or drain, sump or septic tank; or

2) water or waterborne material below the surface of the ground, including but not limited to water or waterborne material that exerts pressure on or flows, seeps, or leaks through or into a covered "installation project", sidewalk, driveway, foundation, swimming pool, or other structure.

b. **Coverage Limitations** -- "We" do not cover loss or damage caused by or resulting from:

1) escape of water or waterborne material from a sump pit not equipped with a sump pump;

Copyright, American Association of Insurance Services, Inc., 2010

RLI_000258

2) failure to perform routine maintenance and repair of all sump pumps and related equipment; and

3) failure to perform routine maintenance of sewers and drains including keeping sewers and drains free from obstructions. This limitation does not apply if "you" are not responsible for the maintenance of sewers or drains that results in loss or damage.

c. **Limit** -- The most "we" pay in any one occurrence under this Supplemental Coverage is $10,000.

6. **Temporary Storage Locations** --

a. **Coverage** -- "We" cover direct physical loss or damage caused by a covered peril to

1) materials, supplies, fixtures, machinery, or equipment that will become a permanent part of a covered "installation project"; and

2) business personal property as described under Supplemental Coverages - Business Personal Property

while temporarily in storage at a location away from "your" "jobsite".

b. **We Do Not Cover** -- "We" do not cover property in a temporary storage location if the property has not been specifically allocated to or otherwise identified with a covered "installation project".

c. **Limit** -- The most "we" pay in any one occurrence for loss to property at a storage location is $10,000.

7. **Transit** --

a. **Coverage** -- "We" cover direct physical loss or damage caused by a covered peril to materials, supplies, machinery, fixtures, and equipment that will become a permanent part of a covered "installation project" while they are in transit.

b. **Limit** -- The most "we" pay in any one occurrence for loss to property in transit is $10,000.

## PERILS COVERED

"We" cover risks of direct physical loss or damage unless the loss is limited or caused by a peril that is excluded.

## PERILS EXCLUDED

1. "We" do not pay for loss or damage caused directly or indirectly by one or more of the following excluded causes or events. Such loss or damage is excluded regardless of other causes or events that contribute to or aggravate the loss, whether such causes or events act to produce the loss before, at the same time as, or after the excluded causes or events.

a. **Civil Authority** -- Order of any civil authority, including seizure, confiscation, destruction, or quarantine of property.

"We" do cover loss resulting from acts of destruction by the civil authority to prevent the spread of fire, unless the fire is caused by a peril excluded under this coverage.

b. **Earth Movement** -- Any "earth movement".

However, if eruption, explosion, or effusion of a volcano results in "volcanic action", "we" will pay for the loss or damage caused by that "volcanic action".

If "earth movement" results in fire, "we" will pay for the loss or damage caused by that fire. If "earth movement" (other than eruption, explosion, or effusion of a volcano) results in explosion, "we" will pay for the loss or damage caused by that explosion.

This exclusion does not apply to covered property while in transit.

c. **Flood** -- "Flood".

"We" also do not cover waterborne material carried or otherwise moved by "flood", whether or not driven by wind, including storm surge, or material carried or otherwise moved by mudslide or mudflow.

Copyright, American Association of Insurance Services, Inc., 2010
INSURED

RLI_000259

However, if "flood" results in fire, explosion, or sprinkler leakage, "we" will pay for the loss or damage caused by that fire, explosion, or sprinkler leakage.

This exclusion does not apply to covered property while in transit.

d.  **Fungus** -- Except as provided under Coverage Extensions - Limited Fungus Coverage, the existence of or any activity of "fungus".

But if "fungus" results in a "specified peril", "we" cover loss or damage caused by that "specified peril".

This exclusion does not apply to:

1)  loss that results from fire or lightning; or

2)  collapse caused by hidden decay.

e.  **Nuclear Hazard** -- Nuclear reaction, nuclear radiation, or radioactive contamination (whether controlled or uncontrolled; whether caused by natural, accidental, or artificial means). Loss caused by nuclear hazard is not considered loss caused by fire, explosion, or smoke. Direct loss by fire resulting from the nuclear hazard is covered.

f.  **Ordinance Or Law** -- Enforcement of any code, ordinance, or law regulating the use, construction, or repair of any building or structure; or requiring the demolition of any building or structure including the cost of removing its debris.

"We" do not pay for loss or increased cost regardless if the loss or increased cost is caused by or results from the:

1)  enforcement of any code, ordinance, or law even if a building or structure has not been damaged; or

2)  increased costs that "you" incur because of "your" compliance with a code, ordinance, or law during the construction, repair, rehabilitation, remodeling, or razing of a building or structure, including the removal of debris, following direct physical loss or damage to the property.

g.  **Sewer, Septic Tank, Sump, Or Drain Backup And Water Below The Surface** -- Except as provided under Supplemental Coverages - Sewer Backup:

1)  water or waterborne material that backs up, overflows or is otherwise discharged through a sewer or drain, sump or septic tank, eaves trough or downspout; or

2)  water or waterborne material below the surface of the ground, whether naturally or artificially occurring, including but not limited to water or waterborne material that exerts pressure on or flows, seeps, or leaks through or into a covered "installation project", sidewalk, driveway, foundation, swimming pool, or other structure.

But if sewer, drain, sump, septic tank, eaves trough, or downspout backup and water or waterborne material below the surface results in fire, explosion, or sprinkler leakage, "we" cover the loss or damage caused by that fire, explosion, or sprinkler leakage.

This exclusion does not apply to covered property while in transit.

h.  **War And Military Action** --

1)  War, including undeclared war or civil war; or

2)  a warlike action by a military force, including action taken to prevent or defend against an actual or expected attack, by any government, sovereign, or other authority using military personnel or other agents; or

3)  insurrection, rebellion, revolution, or unlawful seizure of power including action taken by governmental authority to prevent or defend against any of these.

With regard to any action that comes within the "terms" of this exclusion and involves nuclear reaction, nuclear radiation, or radioactive contamination, this War And Military Action exclusion will apply in place of the Nuclear Hazard exclusion.

Copyright, American Association of Insurance Services, Inc., 2010

RLI_000260

2. "We" do not pay for loss or damage that is caused by or results from one or more of the following:

a. **Contamination Or Deterioration** -- "We" do not pay for loss or damage caused by or resulting from contamination or deterioration, including but not limited to corrosion, decay, rust, or any quality, fault, or weakness in covered property that causes it to damage or destroy itself.

But if contamination or deterioration results in a covered peril, "we" do cover the loss or damage caused by that covered peril.

b. **Criminal, Fraudulent, Dishonest, Or Illegal Acts** -- "We" do not pay for loss or damage caused by or resulting from criminal, fraudulent, dishonest, or illegal acts committed alone or in collusion with another by:

1) "you";

2) others who have an interest in the property;

3) others to whom "you" entrust the property;

4) "your" partners, officers, directors, trustees, joint venturers, or "your" members or managers if "you" are a limited liability company; or

5) the employees or agents of 1), 2), 3), or 4) above, whether or not they are at work.

This exclusion does not apply to acts of destruction by "your" employees, but "we" do not pay for theft by employees.

This exclusion does not apply to covered property in the custody of a carrier for hire.

c. **Defect, Weakness, Or Inadequacy In Materials** -- "We" do not pay for loss or damage caused by or resulting from a defect, weakness, inadequacy, fault, or unsoundness in materials.

But if a defect, weakness, inadequacy, fault, or unsoundness as described above results in a covered peril, "we" do cover the loss or damage caused by that covered peril.

d. **Defects, Errors, Or Omissions In Property** -- "We" do not pay for loss or damage caused by or resulting from inherent defects, errors, or omissions in covered property (whether negligent or not) relating to:

1) design or specifications;

2) workmanship or construction; or

3) repair, renovation, or remodeling.

But if a defect, error or omission as described above results in a covered peril, "we" do cover the loss or damage caused by that covered peril.

e. **Delay In Completion And Increased Installation Costs** --

1) "We" do not pay for loss or damage caused directly or indirectly by a:

a) delay in the completion of installation, construction, or rigging of an "installation project" or any portion of a building or "installation project"; or

b) change in the sequence of installation, construction, or rigging of an "installation project" or any portion of a building or "installation project"

regardless of the cause of the delay in completion or change in sequence.

2) "We" also do not pay for increased installation or construction costs caused by or resulting from a delay in completion or change in sequence as described above under items e.1), a) and b). Increased installation or construction costs include, but are not limited to:

a) general conditions;

b) increased installation or construction costs and additional installation or construction expenses;

c) increased overhead, increased material costs, and increased labor costs;

Copyright, American Association of Insurance Services, Inc., 2010

INSURED

RLI_000261

d)  soft costs; and

e)  loss of earnings and loss of rental income.

3)  General conditions means general conditions and extended general conditions including, but not limited to, costs of additional:

a)  utility charges;

b)  maintenance;

c)  facilities;

d)  communications; and

e)  administrative personnel.

f.  **Electrical Currents** -- "We" do not pay for loss or damage caused by or resulting from arcing or by electrical currents other than lightning.

But if arcing or electrical currents other than lightning result in a "specified peril", "we" do cover the loss or damage caused by that "specified peril".

g.  **Loss Of Use And Consequential Loss** -- "We" do not pay for loss or damage caused by or resulting from loss of use, delay, or loss of market. "We" also do not pay for any consequential loss or damage of any nature.

h.  **Mechanical Breakdown** -- "We" do not pay for loss or damage caused by or resulting from:

1)  mechanical breakdown; or

2)  rupturing or bursting of moving parts of machinery caused by centrifugal force.

But if a mechanical breakdown or rupturing or bursting of moving parts of machinery caused by centrifugal force results in a "specified peril", "we" do cover the loss or damage caused by that "specified peril".

i.  **Missing Property** -- "We" do not pay for missing property where the only proof of loss is unexplained or mysterious disappearance of

covered property, or shortage of property discovered on taking inventory, or any other instance where there is no physical evidence to show what happened to the covered property.

This exclusion does not apply to covered property in the custody of a carrier for hire.

j.  **Pollutants** -- "We" do not pay for loss or damage caused by or resulting from release, discharge, seepage, migration, dispersal, or escape of "pollutants":

1)  unless the release, discharge, seepage, migration, dispersal, or escape is caused by a "specified peril"; or

2)  except as specifically provided under the Supplemental Coverages - Pollutant Cleanup and Removal.

"We" do cover any resulting loss caused by a "specified peril".

k.  **Steam Boiler Explosion** -- "We" do not pay for loss or damage caused by or resulting from an explosion of steam boilers, steam pipes, steam turbines, or steam engines.

But if an explosion of steam boilers, steam pipes, steam turbines, or steam engines results in a fire or combustion explosion, "we" cover the loss or damage caused by that fire or combustion explosion. "We" also cover loss or damage caused by or resulting from the explosion of gas or fuel in a firebox, combustion chamber, or flue.

l.  **Temperature/Humidity** -- "We" do not pay for loss or damage caused by or resulting from dryness, dampness, humidity, or changes in or extremes of temperature.

But if dryness, dampness, humidity, or changes in or extremes of temperature results in a covered peril, "we" do cover the loss or damage caused by that covered peril.

m.  **Voluntary Parting** -- Except as provided under Coverage Extensions - Fraud and Deceit, "we" do not pay for loss or damage caused by or resulting from voluntary parting with title to or possession of any property because of any fraudulent scheme, trick, or false pretense.

Copyright, American Association of Insurance Services, Inc., 2010

RLI_000262

n. **Wear And Tear** -- "We" do not pay for loss or damage caused by or resulting from wear and tear, marring, or scratching.

But if wear and tear, marring, or scratching results in a covered peril, "we" do cover the loss or damage caused by that covered peril.

## WHAT MUST BE DONE IN CASE OF LOSS

1. **Notice** -- In case of a loss, "you" must:

   a. give "us" or "our" agent prompt notice including a description of the property involved ("we" may request written notice); and

   b. give notice to the police when the act that causes the loss is a crime.

2. **You Must Protect Property** -- "You" must take all reasonable steps to protect covered property at and after an insured loss to avoid further loss.

   a. **Payment Of Reasonable Costs** -- "We" do pay the reasonable costs incurred by "you" for necessary repairs or emergency measures performed solely to protect covered property from further damage by a peril insured against if a peril insured against has already caused a loss to covered property. "You" must keep an accurate record of such costs. "Our" payment of reasonable costs does not increase the "limit".

   b. **We Do Not Pay** -- "We" do not pay for such repairs or emergency measures performed on property that has not been damaged by a peril insured against.

3. **Proof Of Loss** -- "You" must send "us", within 60 days after "our" request, a signed, sworn proof of loss. This must include the following information:

   a. the time, place, and circumstances of the loss;

   b. other policies of insurance that may cover the loss;

   c. "your" interest and the interests of all others in the property involved, including all mortgages and liens;

   d. changes in title of the covered property during the policy period; and

   e. estimates, specifications, inventories, and other reasonable information that "we" may require to settle the loss.

4. **Examination** -- "You" must submit to examination under oath in matters connected with the loss as often as "we" reasonably request and give "us" sworn statements of the answers. If more than one person is examined, "we" have the right to examine and receive statements separately and not in the presence of others.

5. **Records** -- "You" must produce records, including tax returns and bank microfilms of all canceled checks relating to value, loss, and expense and permit copies and extracts to be made of them as often as "we" reasonably request.

6. **Damaged Property** -- "You" must exhibit the damaged and undamaged property as often as "we" reasonably request and allow "us" to inspect or take samples of the property.

7. **Volunteer Payments** -- "You" must not, except at "your" own expense, voluntarily make any payments, assume any obligations, pay or offer any rewards, or incur any other expenses except as respects protecting property from further damage.

8. **Abandonment** -- "You" may not abandon the property to "us" without "our" written consent.

9. **Cooperation** -- "You" must cooperate with "us" in performing all acts required by this policy.

## VALUATION

1. **Cost To Repair, Replace, Or Rebuild** --

   a. **If Property Is Repaired, Replaced, Or Rebuilt** -- If covered property is repaired, replaced, or rebuilt, the value of covered property will be based on the reasonable and necessary costs and expenses "you" incur to repair, replace, or rebuild the covered property with materials of like kind and quality. The reasonable and necessary

Copyright, American Association of Insurance Services, Inc., 2010

costs and expenses may include material, labor, reasonable overhead and profit, and delivery charges.

b. **If Property Is Not Repaired, Replaced, Or Rebuilt** -- If covered property is not repaired, replaced, or rebuilt, the value of covered property will be based on the estimated reasonable and necessary costs that would have been incurred to repair, replace, or rebuild the covered property with material of like kind and quality.

However, the value of covered property does not include any unincurred or estimated costs for overhead, profit, or delivery charges.

c. **Payment Limitation** -- In no event will "we" pay more than the "limit" indicated on the "schedule of coverages".

2. **Pair Or Set** -- The value of a lost or damaged article that is part of a pair or set is based on a reasonable proportion of the value of the entire pair or set. The loss is not considered a total loss of the pair or set.

3. **Loss To Parts** -- The value of a lost or damaged part of an item that consists of several parts when it is complete is based on the value of only the lost or damaged part or the cost to repair or replace it.

---

## HOW MUCH WE PAY

---

1. **Insurable Interest** -- "We" do not pay for more than "your" insurable interest in any property.

2. **Deductible** -- "We" pay only that part of "your" loss over the deductible amount indicated on the "schedule of coverages" in any one occurrence.

3. **Loss Settlement Terms** -- Subject to paragraphs 1., 2., 4., 5., and 6. under How Much We Pay, "we" pay the lesser of:

a. the amount determined under Valuation;

b. the cost to repair, replace, or rebuild the property with material of like kind and quality to the extent practicable; or

c. the "limit" that applies to the covered property.

4. **Catastrophe Limit** -- The most "we" pay in any one occurrence is the Catastrophe Limit indicated on the "schedule of coverages" regardless if an occurrence or loss involves:

a. one or more "installation projects";

b. one or more "jobsites"; or

c. any combination of "installation projects", "jobsites", or coverages described under Coverage Extensions or Supplemental Coverages.

5. **Insurance Under More Than One Coverage** -- If more than one coverage of this policy insures the same loss, "we" pay no more than the actual claim, loss, or damage sustained.

6. **Insurance Under More Than One Policy** --

a. **Proportional Share** -- "You" may have another policy subject to the same "terms" as this policy. If "you" do, "we" will pay "our" share of the covered loss. "Our" share is the proportion that the applicable "limit" under this policy bears to the "limit" of all policies covering on the same basis.

b. **Excess Amount** -- If there is another policy covering the same loss, other than that described above, "we" pay only for the amount of covered loss in excess of the amount due from that other policy, whether "you" can collect on it or not. But "we" do not pay more than the applicable "limit".

---

## LOSS PAYMENT

---

1. **Loss Payment Options** --

a. **Our Options** -- In the event of loss covered by this coverage form, "we" have the following options:

1) pay the value of the lost or damaged property;

2) pay the cost of repairing or replacing the lost or damaged property;

Copyright, American Association of Insurance Services, Inc., 2010
INSURED

RLI_000264

3) rebuild, repair, or replace the property with other property of equivalent kind and quality, to the extent practicable, within a reasonable time; or

4) take all or any part of the property at the agreed or appraised value.

b. **Notice Of Our Intent To Rebuild, Repair, Or Replace** -- "We" must give "you" notice of "our" intent to rebuild, repair, or replace within 30 days after receipt of a duly executed proof of loss.

2. **Your Losses** --

a. **Adjustment And Payment Of Loss** -- "We" adjust all losses with "you". Payment will be made to "you" unless another loss payee is named in the policy.

b. **Conditions For Payment Of Loss** -- An insured loss will be payable 30 days after:

1) a satisfactory proof of loss is received; and

2) the amount of the loss has been established either by written agreement with "you" or the filing of an appraisal award with "us".

3. **Property Of Others** --

a. **Adjustment And Payment Of Loss To Property Of Others** -- Losses to property of others may be adjusted with and paid to:

1) "you" on behalf of the owner; or

2) the owner.

b. **We Do Not Have To Pay You If We Pay The Owner** -- If "we" pay the owner, "we" do not have to pay "you". "We" may also choose to defend any suits brought by the owners at "our" expense.

---

## REPORTING CONDITIONS

---

1. **Reports** --

a. **You Will Report To Us** -- Within 30 days after the end of each reporting period indicated on the "schedule of coverages", "you" will report to "us" the total receipts (collected and uncollected) earned from "your" "installation projects" during the reporting period indicated on the "schedule of coverages". Receipts include the amounts "you" earn from materials, labor, reasonable overhead and profit, and delivery charges that are part of "your" "installation projects".

b. **Cancellation** -- If "your" coverage is canceled, "you" will report the total receipts (collected and uncollected) earned from "your" "installation projects" up to and including the date of cancellation and pay any additional premium due.

2. **Premium Computation And Adjustment** -- The premium will be adjusted as of each adjustment period indicated on the "schedule of coverages". The computed premium will be determined by multiplying the total earned receipts by the rate indicated on the schedule.

a. **Annual Adjustment** -- When an annual adjustment period is indicated on the "schedule of coverages", "we" will compare the total computed premium to the deposit premium. If it is more than the deposit premium, "you" will pay "us" the difference. If it is less than the deposit premium, "we" will pay "you" the difference subject to the minimum premium indicated on the schedule.

b. **Other Adjustment Period** -- When any other premium adjustment period is indicated, "we" will apply the computed premium to the deposit premium until it is exhausted. "You" will pay "us" all premiums that exceed the deposit premium. At the end of the policy period, if the computed premium is less than the deposit premium, "we" will pay "you" the difference subject to the minimum premium indicated on the "schedule of coverages".

3. **Provisions That Affect How Much We Pay** -- The following provisions apply to reports that are submitted and may affect How Much We Pay:

a. **Failure To Submit Reports** -- If "you" have failed to submit the required reports or no report has been submitted, the most "we" will pay is 90% of the "limit".

Copyright, American Association of Insurance Services, Inc., 2010

INSURED

RLI_000265

b.  **Reported Values Are Less Than The Full Value** -- If "your" last report before a loss shows less than the actual total receipts earned during the reporting period, "we" will only pay a part of the loss. "We" will not pay a greater portion of the loss, prior to the application of the deductible, than the total receipts "you" reported divided by the total receipts "you" actually earned from "your" projects during the reporting period.

c.  **We Will Not Pay More Than The Limit** -- "We" will not pay more than the applicable "limit" regardless of any reported value used in computing the premium.

---

## OTHER CONDITIONS

---

1.  **Appraisal** -- If "you" and "we" do not agree on the amount of the loss or the value of covered property, either party may demand that these amounts be determined by appraisal.

    If either makes a written demand for appraisal, each will select a competent, independent appraiser and notify the other of the appraiser's identity within 20 days of receipt of the written demand. The two appraisers will then select a competent, impartial umpire. If the two appraisers are unable to agree upon an umpire within 15 days, "you" or "we" can ask a judge of a court of record in the state where the property is located to select an umpire.

    The appraisers will then determine and state separately the amount of each loss.

    The appraisers will also determine the value of covered property items at the time of the loss, if requested.

    If the appraisers submit a written report of any agreement to "us", the amount agreed upon will be the amount of the loss. If the appraisers fail to agree within a reasonable time, they will submit only their differences to the umpire. Written agreement so itemized and signed by any two of these three, sets the amount of the loss.

    Each appraiser will be paid by the party selecting that appraiser. Other expenses of the appraisal and the

the compensation of the umpire will be paid equally by "you" and "us".

2.  **Benefit To Others** -- Insurance under this coverage will not directly or indirectly benefit anyone having custody of "your" property.

3.  **Conformity With Statute** -- When a condition of this coverage is in conflict with an applicable law, that condition is amended to conform to that law.

4.  **Estates** -- This provision applies only if the insured is an individual.

    a.  **Your Death** -- On "your" death, "we" cover the following as an insured:

        1)  the person who has custody of "your" property until a legal representative is qualified and appointed; or

        2)  "your" legal representative.

        This person or organization is an insured only with respect to property covered by this coverage.

    b.  **Policy Period Is Not Extended** -- This coverage does not extend past the policy period indicated on the declarations.

5.  **Misrepresentation, Concealment, Or Fraud** -- This coverage is void as to "you" and any other insured if, before or after a loss:

    a.  "you" or any other insured have willfully concealed or misrepresented:

        1)  a material fact or circumstance that relates to this insurance or the subject thereof; or

        2)  "your" interest herein.

    b.  there has been fraud or false swearing by "you" or any other insured with regard to a matter that relates to this insurance or the subject thereof.

6.  **Policy Period** -- "We" pay for a covered loss that occurs during the policy period.

7.  **Recoveries** -- If "we" pay "you" for the loss and lost or damaged property is recovered, or payment is made by those responsible for the loss, the following provisions apply:

Copyright, American Association of Insurance Services, Inc., 2010

RLI_000266

a. "you" must notify "us" promptly if "you" recover property or receive payment;

b. "we" must notify "you" promptly if "we" recover property or receive payment;

c. any recovery expenses incurred by either are reimbursed first;

d. "you" may keep the recovered property but "you" must refund to "us" the amount of the claim paid or any lesser amount to which "we" agree; and

e. if the claim paid is less than the agreed loss due to a deductible or other limiting "terms" of this policy, any recovery will be prorated between "you" and "us" based on "our" respective interest in the loss.

8. **Restoration Of Limits** -- Except as indicated under Coverage Extensions - Limited Fungus Coverage, a loss "we" pay under this coverage does not reduce the applicable "limits".

9. **Subrogation** -- If "we" pay for a loss, "we" may require "you" to assign to "us" "your" right of recovery against others. "You" must do all that is necessary to secure "our" rights. "We" do not pay for a loss if "you" impair this right to recover.

"You" may waive "your" right to recover from others in writing before a loss occurs.

10. **Suit Against Us** -- No one may bring a legal action against "us" under this coverage unless:

a. all of the "terms" of this coverage have been complied with; and

b. the suit has been brought within two years after "you" first have knowledge of the loss.

If any applicable law makes this limitation invalid, then suit must begin within the shortest period permitted by law.

11. **Territorial Limits** -- "We" cover property while it is in the United States of America, its territories and possessions, Canada, and Puerto Rico.

12. **Carriers For Hire** -- "You" may accept bills of lading or shipping receipts issued by carriers for hire that limit their liability to less than the actual cash value of the covered property.

## ADDITIONAL COVERAGE LIMITATIONS

**When Coverage Ceases** -- Coverage ends when one of the following occurs:

1. this policy expires or is canceled;

2. the covered "installation project" is accepted by the purchaser;

3. "your" insurable interest in the covered property ceases;

4. "you" abandon the "installation project" with no intent to complete it;

5. the "installation project" has been completed for more than 30 days; or

6. the covered property has been put to its intended use. However, this does not apply to roofs or walls.

## DEFINITIONS

1. "Earth movement" means:

a. earthquake, including land shock waves or tremors before, during or after a volcanic eruption;
b. landslide, mudslide, or mudflow;

c. mine subsidence whether or not the non-natural mine is currently in use;

d. any other movement of earth, including sinking (other than "sinkhole collapse"), shifting, or rising of earth including, but not limited to, erosion, expansion, shrinking, freezing, thawing, improper soil compaction, and movement of water under the surface of the ground that cause cracking, settling, or shifting of foundations, buildings, or structures; or

e. eruption, explosion, or effusion of a volcano.

2. "Flood" means an overflowing or inundation by water of an area that was previously and normally dry or not covered by water, whether caused artificially or naturally, by human or animal forces or by an act of nature. "Flood" includes, but is not limited to:

Copyright, American Association of Insurance Services, Inc., 2010

RLI_000267

a. overflow of inland or tidal waters, waves, tidal waves, or tsunamis, or spray that results from any of these, all whether driven by wind or not, including but not limited to storm surge;

b. unusual and rapid accumulation or runoff of surface waters from any source; or

c. mudslides or mudflows if caused by:

   1) unusual and rapid accumulation or runoff of surface waters or waves; or

   2) currents of water exceeding anticipated cyclical levels.

3. "Fungus" means:

a. a fungus, including but not limited to mildew and mold;

b. a protist, including but not limited to algae and slime mold;

c. wet rot and dry rot;

d. a bacterium; or

e. a chemical, matter, or compound produced or released by a fungus, a protist, wet rot, dry rot, or a bacterium, including but not limited to toxins, spores, fragments, and metabolites such as microbial volatile organic compounds.

4. "Installation project" means an installation or construction project including, but not limited to, a repair or maintenance project that involves the installation, construction, or rigging of materials, supplies, fixtures, machinery, or equipment.

5. "Jobsite" means any location, project, or work site where "you" are involved in the installation, construction, or rigging of materials, supplies, fixtures, machinery, or equipment.

6. "Limit" means the amount of coverage that applies.

7. "Pollutant" means:

a. any solid, liquid, gaseous, thermal, or radioactive irritant or contaminant, including acids, alkalis, chemicals, fumes, smoke, soot, vapor, and waste. Waste includes materials to be recycled, reclaimed, or reconditioned, as well as disposed

b. electrical or magnetic emissions, whether visible or invisible, and sound emissions.

8. "Schedule of coverages" means:

a. all pages labeled "schedule of coverages" or schedules that pertain to this coverage; and

b. declarations or supplemental declarations that pertain to this coverage.

9. "Sinkhole collapse" means the sudden settlement or collapse of earth supporting the covered property into subterranean voids created by the action of water on a limestone or similar rock formation. It does not include the value of the land or the cost of filling sinkholes.

10. "Specified perils" means aircraft; civil commotion; explosion; falling objects; fire; hail; leakage from fire extinguishing equipment; lightning; riot; "sinkhole collapse"; smoke; sonic boom; vandalism; vehicles; "volcanic action"; water damage; weight of ice, snow, or sleet; and windstorm.

Falling objects does not include loss to:

a. personal property in the open; or

b. the interior of buildings or structures or to personal property inside buildings or structures unless the exterior of the roofs or walls are first damaged by a falling object.

Water damage means the sudden or accidental discharge or leakage of water or steam as a direct result of breaking or cracking of a part of the system or appliance containing the water or steam.

11. "Terms" means all provisions, limitations, exclusions, conditions, and definitions that apply.

12. "Volcanic action" means airborne volcanic blast or airborne shock waves; ash, dust, or particulate matter; or lava flow.

"Volcanic action" does not include the cost to remove ash, dust, or particulate matter that does not cause direct physical loss to the covered property.

---

IM 7101 08 10

Copyright, American Association of Insurance Services, Inc., 2010

INSURED

RLI_000268

Policy Number: ILM0303051

RLI Insurance Company

**AAIS**
**IM 7115 08 10**
**Page 1 of 1**

# TESTING AND COMMISSIONING SCHEDULE

## INSTALLATION FLOATER

(The entries required to complete this schedule
will be shown below or on the "schedule of coverages".)

## TESTING SCHEDULE

**Testing Limit**

$ 500,000

**Testing Deductible**

$ 1,000

**Description of Covered Project**

All Projects

**Location of Project**

All Locations

**Testing Period**

10 days

**Type of Testing** (check one)

☒ "Cold Testing"      ☐ "Hot Testing"      ☐ "Commissioning"

## PROTECTIVE SAFEGUARDS

Described Safeguards

None

**IM 7115 08 10**

Copyright, American Association of Insurance Services, Inc., 2010

INSURED

RLI_000269

Policy Number: ILM0303051                                              RLI Insurance Company

**AAIS**                              This endorsement changes the
**IM 7114 08 10**                     Installation Floater Coverage
**Page 1 of 2**                       – PLEASE READ THIS CAREFULLY –

# TESTING AND COMMISSIONING COVERAGE

## ADDITIONAL DEFINITIONS

1. "Cold testing" means the checking of the component parts of equipment or machinery by mechanical, electrical, hydrostatic, or other forms of testing under dry run conditions.

   "Cold testing" does not include:

   a. the firing of furnaces or any application of direct or indirect heat;

   b. the use of feedstock or other materials for processing; or

   c. the connection of electrical generating, transforming, converting, or rectifying equipment to a power grid or other load circuit.

2. "Hot testing" means the checking of the component parts of equipment or machinery under load or operational conditions.

   "Hot testing" includes:

   a. the firing of furnaces or any application of direct or indirect heat;

   b. the use of feedstock or other materials for processing or other means to simulate working conditions; or

   c. the connection of electrical generating, transforming, converting, or rectifying equipment to a power grid or other load circuit for the purposes of checking the equipment or machinery.

3. "Commissioning" means the operation of equipment or machinery with feedstock or other materials for processing under production conditions for the purposes of attaining specification requirements or for training operational personnel.

## SUPPLEMENTAL COVERAGES

If this endorsement is attached to the Contractors' Form, the following Supplemental Coverage applies to Installation Floater coverage as described under Property Covered.

**Testing And Commissioning Coverage --**

1. **Coverage** -- If coverage is indicated on the Testing And Commissioning Schedule, "we" cover direct physical loss to covered property caused by or resulting from "cold testing", "hot testing", or "commissioning".

2. **Coverage Limitations** -- "We" only cover loss:

   a. to covered property that is part of an "installation project" described on the Testing And Commissioning Schedule; and

   b. caused by or resulting from the type of testing indicated on the Testing And Commissioning Schedule.

3. **Testing Period Limitation** -- After testing begins, it must be completed within the number of days indicated as the testing period on the Testing And Commissioning Schedule.

   "We" do not cover loss caused by or resulting from testing if the loss occurs after the testing period.

4. **Limit** -- The most "we" pay for loss caused by or resulting from testing in any one occurrence is the Testing Limit indicated on the Testing And Commissioning Schedule.

   The "limit" for Testing And Commissioning Coverage is separate from and not part of nor in addition to the applicable "limit" for coverage described under Property Covered in the Installation Floater Coverage form.

Copyright, American Association of Insurance Services, Inc., 2010

INSURED

RLI_000270

5. **Deductible** -- "We" only pay that part of "your" testing loss over the deductible amount indicated on the Testing And Commissioning Schedule in any one occurrence.

## CONDITIONS THAT MAY EFFECT COVERAGE

**Protective Safeguards** --

1. **You Are Required To Maintain Protective Safeguards** -- "You" are required to maintain the protective safeguards that are described on the Testing And Commissioning Schedule.

2. **Conditions Under Which We Do Not Pay For A Testing Loss** -- "We" do not pay for loss caused by or resulting from testing if, prior to the loss, "you":

   a. had knowledge or should have had knowledge of any suspension or impairment in any protective safeguard described on the schedule and "you" did not notify "us"; or

   b. failed to maintain:

      1) any described supervision or service; or

      2) in complete working order any described protective device which "you" control.

## PERILS EXCLUDED

The exclusions for Electrical Currents, Mechanical Breakdown, and Steam Boiler Explosion still apply except to the extent that coverage is provided under this endorsement.

IM 7114 08 10

Copyright, American Association of Insurance Services, Inc., 2010

RLI_000271

Policy Number: ILM0303051    RLI Insurance Company

AAIS
IM 7120 08 10
Page 1 of 1

This endorsement changes the
Installation Floater Coverage
– PLEASE READ THIS CAREFULLY –

# CONTRACT PENALTY ENDORSEMENT

(The entries required to complete this endorsement
will be shown below or on the "schedule of coverages".)

## CONTRACT PENALTY SCHEDULE

**Contract Penalty Limit**                                            $10,000

☒  Equipment Breakdown And Testing
Coverage included (check if applicable)

**Equipment Breakdown And Testing Limit**                  $10,000

## SUPPLEMENTAL COVERAGES

If this endorsement is attached to the Contractors' Form, the following Supplemental Coverage applies to Installation Floater coverage as described under Property Covered.

**Contract Penalty –**

1. **Coverage –**

   a. "We" pay for the cost of contractual penalties for noncompletion that "you" are assessed or are required to pay because "you" are unable to complete installation, construction, or rigging of a covered "installation project" on time in accordance with the provisions or conditions of the construction or installation contract.

   b. Except as described under Equipment Breakdown And Testing Coverage, the Contract Penalty Limit shown on the Contract Penalty Schedule is the most "we" pay in any one occurrence for all contractual penalties.

2. **Coverage Limitation –** "Your" inability to complete installation, construction, or rigging on time must be as a direct result of loss or damage by a covered peril to a covered "installation project".

3. **Equipment Breakdown And Testing Coverage –**

   a. If Equipment Breakdown And Testing Coverage is indicated on the Contract Penalty Schedule and the Equipment Breakdown And Testing Coverage endorsement is also attached to the Installation Floater Coverage form, coverage under this endorsement is extended to contractual penalties for noncompletion that "you" are assessed or are required to pay because "you" are unable to complete installation, construction, or rigging of a covered "installation project" on time in accordance with the provisions or conditions of the construction or installation contract. The assessment of the penalties must be the result of an "accident".

   b. The Equipment Breakdown And Testing Limit is the most "we" pay in any "one accident" for all contractual penalties resulting from an "accident". The Equipment Breakdown And Testing Limit cannot be combined with or added to the Contract Penalty Limit.

   c. Refer to the Equipment Breakdown And Testing Coverage endorsement for a definition of "accident" and "one accident".

**IM 7120 08 10**

Copyright, American Association of Insurance Services, Inc., 2010
INSURED

RLI_000272

Policy Number: ILM0303051                                                    RLI Insurance Company

**AAIS**                           This endorsement changes
**CL 0811 09 18**                         the policy
**Page 1 of 3**                    -- PLEASE READ THIS CAREFULLY --

# CANNABIS ITEMS AND ACTIVITIES EXCLUSION

1. The following definitions are added.

   a. "Cannabis"

      1) Except as provided in item 1.a.2) below, "cannabis" means all parts of the plant Cannabis sativa L., whether growing or not. This applies even if plant material has been changed or mixed into any consumable item or product. Consumable items or products include but are not limited to any:

         a) compound;

         b) concentrate,

         c) derivative;

         d) extract;

         e) manufacture;

         f) mixture;

         g) preparation;

         h) resin; or

         i) salt;

         all whether crude or purified.

      2) "Cannabis" does not include:

         a) the mature stalks of the plant Cannabis sativa L., or fiber produced from such stalks;

         b) oil or cake made from the seeds of the plant Cannabis sativa L.;

         c) any compound, derivative, extract, manufacture, mixture, preparation, or salt of item 1.a.2)a) or item 1.a.2)b) above; or

         d) the sterilized seed of the plant Cannabis sativa L., which is incapable of germination.

   b. "Cannabis activities" means the:

      1) cooking;

      2) delivering, distributing, or transporting;

      3) growing, including but not limited to cultivating, harvesting, or planting;

      4) manufacturing;

      5) packaging or repackaging;

      6) preparing;

      7) processing;

      8) producing;

      9) selling;

      10) storing; or

      11) testing;

      of "cannabis" in any form or quantity.

   c. "Cannabis items" means:

      1) "cannabis"; and

      2) any equipment, products, or materials used or primarily intended or designed for use in:

         a) "cannabis activities"; or

         b) ingesting, inhaling, smoking, vaporizing, or otherwise consuming "cannabis" in any form or quantity.

2. If this policy provides property coverage, the following exclusion is added with respect to such coverage.

   **Cannabis Items And Activities – Property Exclusion**

   a. "We" do not pay for loss to:

Copyright, American Association of Insurance Services, Inc., 2018

INSURED

RLI_000273

**AAIS**
**CL 0811 09 18**
**Page 2 of 3**

1) "cannabis items"; or

2) any other property if the loss arises out of "cannabis activities" by:

    a) any person or entity insured under this policy;

    b) anyone acting at the direction or on behalf of a person or entity insured under this policy; or

    c) any tenants, roomers, boarders, or guests of a property insured under this policy.

b. Item 2.a.2) above applies to, but is not limited to, any loss caused by or resulting from:

1) smoke;

2) vapor;

3) gas;

4) condensation;

5) humidity;

6) moisture; or

7) any other substance;

discharged, dispersed, disposed of, emitted, escaped, leached, leaked, migrated, produced, released, seeped, or spilled as a result of such "cannabis activities".

c. Except as provided in item 2.d. below, loss arising out of "cannabis activities" will not be considered loss caused by any other peril, including but not limited to vandalism or malicious mischief, even if this policy provides coverage for loss caused by such peril.

d. To the extent that this policy provides coverage for loss caused by fire or explosion, this exclusion does not apply to direct loss to covered property caused by a fire or explosion resulting from "cannabis activities" or "cannabis items".

3. If this policy provides liability coverage, the following exclusion is added with respect to such coverage.

**Cannabis Items And Activities – Liability Exclusion**

a. "We" do not provide liability coverage for any person or entity insured under this policy for liability arising out of:

1) the possession of "cannabis items"; or

2) any "cannabis activities".

b. Item 3.a.2) above applies to, but is not limited to, any liability for loss caused by or resulting from:

1) smoke;

2) vapor;

3) gas;

4) condensation;

5) humidity;

6) moisture; or

7) any other substance;

discharged, dispersed, disposed of, emitted, escaped, leached, leaked, migrated, produced, released, seeped, or spilled as a result of such "cannabis activities".

4. The "terms" of this endorsement apply even if "cannabis activities" or the possession of "cannabis items" are legal under the laws of the state, territory, or district in which:

a. this policy was issued; or

b. the loss occurs.

5. To the extent that the "terms" of this endorsement conflict with any other "terms" of this policy, this endorsement will control with respect to coverage for "cannabis items" and "cannabis activities".

Copyright, American Association of Insurance Services, Inc., 2018

RLI_000274

**AAIS**
**CL 0811 09 18**
**Page 3 of 3**

6.  This endorsement:

   a.  clarifies the intent of coverage under this policy; and

   b.  will not be construed to modify, narrow, or negate any exclusion in this policy that applies to:

      1)  contraband;

      2)  controlled substances;

      3)  criminal or illegal acts; or

      4)  illegal transportation or trade.

---

**CL 0811 09 18**

Copyright, American Association of Insurance Services, Inc., 2018
INSURED

RLI_000275

Policy Number: ILM0303051                                      RLI Insurance Company

**AAIS**                          This endorsement changes
**CL 0178 11 01**                      the policy
**Page 1 of 2**                 **– PLEASE READ THIS CAREFULLY –**

# AMENDATORY ENDORSEMENT

## ARKANSAS

1. Under Common Policy Conditions, Cancellation is deleted and replaced by the following:

   **Cancellation and Nonrenewal –** "You" may cancel this policy by returning the policy to "us" or by giving "us" a written notice and stating at what future date coverage is to stop.

   "We" may cancel or not renew this policy, or one or more of its parts, by written notice sent to "you" and any lienholder or loss payee named in the policy at the last mailing addresses known to "us". If notice of cancellation is mailed, proof of mailing will be sufficient proof of notice.

   If this policy has been in effect less than 60 days, "we" may cancel for any reason. "We" will give notice at least ten days before the cancellation is effective.

   After this policy has been in effect 60 days or more, or if it is a renewal of a policy issued by "us", "we" may cancel only on the anniversary date unless the cancellation is based upon at least one of the following reasons:

   a. nonpayment of premium;

   b. fraud or material misrepresentation made by "you" or with "your" knowledge in obtaining the policy, continuing the policy, or in presenting a claim under the policy;

   c. the occurrence of a material change in the risk which substantially increases any hazard insured against after the policy issuance;

   d. violation of any local fire, health, safety, building, or construction regulation or ordinances with respect to any insured property or the occupancy of the property, which substantially increases any hazard insured against under the policy;

   e. nonpayment of membership dues in those cases where "our" bylaws, agreements, or other legal instruments require payment as a condition of the issuance and maintenance of the policy; or

   f. a material violation of a material provision of the policy.

   If "we" cancel this policy for nonpayment of premium, "we" will give notice at least ten days before the cancellation is effective and the notice will state the reason for cancellation. If this policy has been in effect for 60 days or more and "we" cancel for any other reason, "we" will give notice at least 20 days before the cancellation is effective.

   If "we" decide not to renew this policy, "we" will give notice at least 60 days before the expiration date of the policy, or the anniversary date of a policy written for a term longer than one year or without a fixed expiration date.

   "Your" return premium, if any, will be calculated on a pro rata basis and will be refunded to "you" with the cancellation notice or within a reasonable time. Payment or tender of the unearned premium is not a condition of cancellation.

Copyright, American Association of Insurance Services, 2001
INSURED

RLI_000276

2.  Under Common Policy Conditions, the following condition is added:

    **Renewal –** If "we" elect to renew this policy with a premium increase equal to or greater than 25%, "we" will mail written notice of "our" intention to increase the premium by 25% or more to "your" agent at least 30 days prior to the effective date of the renewal and to "you" at least ten days prior to the effective date of the renewal.

3.  Under Common Policy Conditions, the following condition is added:

    **Premium Payment –** If this policy has been issued for a period in excess of 12 months with the premium adjustable on an annual basis, "we" will give "you" and the agent of record written notice of the premium to be charged at least 30 days before the anniversary date. This provision applies only if "you" have given "us" the information necessary to calculate the premium.

CL 0178 11 01

Copyright, American Association of Insurance Services, 2001

INSURED

RLI_000277

Policy Number: ILM0303051                                                      RLI Insurance Company

**AAIS**                          This endorsement changes
**IM 2007 07 20**                        the policy
**Page 1 of 1**                – PLEASE READ THIS CAREFULLY –

# AMENDATORY ENDORSEMENT
## ARKANSAS

1. Under Coverage Extensions, Defense Costs, if applicable, is amended to include the following:

   The expenses "we" incur under Defense Costs will not reduce the applicable "limit" for coverage described under Property Covered.

2. Under What Must Be Done In Case Of Loss, Proof Of Loss is amended to include the following:

   If "you" report a loss to "us", "we" will send "you" the necessary forms within 20 days after "you" first report the loss.

3. Under Valuation, the following is added:

   **Expense Depreciation** -- Pursuant to Arkansas Code Annotated § 23-88-106, "we" are providing notice of the following:

   "Our" payment for loss to covered property may include a deduction for expense depreciation, which means depreciation, including but not limited to the cost of goods, materials, labor, and services necessary to replace, repair, or rebuild damaged property.

   If expense depreciation is applied to a loss to covered property, "we" will provide a written explanation as to how the expense depreciation was calculated.

4. Under Other Conditions, Appraisal is amended to include the following:

   This provision is non-binding on both parties and will apply only if "you" and "we" voluntarily agree to appraisal.

5. Under Other Conditions, Subrogation is amended to include the following:

   If "you" assign to "us" the rights of recovery and "we" recover from another party, "we" will make "you" whole before recovering for "our" loss.

6. In all coverage forms except Cold Storage Locker Coverage, Contingent Cargo Coverage, Motor Truck Cargo Legal Liability Coverage, Riggers' Legal Liability Coverage, and Warehouse Legal Liability Coverage, under Other Conditions, item b. of Suit Against Us is deleted and replaced by the following:

   b.  the suit is commenced within five years after the loss.

---

IM 2007 07 20

Copyright, American Association of Insurance Services, Inc., 2020
INSURED

RLI_000278

# SIGNATURE PAGE

In Witness Whereof, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

Corporate Secretary

President & COO

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CHANGE ENDORSEMENT

ENDORSEMENT EFFECTIVE DATE: 09/14/2021          (12:01 a.m.)

ENDORSEMENT NUMBER: 001

INSURED NAME:
Bob Robison Commercial Flooring, Inc.

| | |
|---|---|
| ☐ ADDITIONAL PREMIUM | $ |
| ☐ RETURN PREMIUM | $ |
| ☒ NIL | $ 0 |
| ☐ | $ |
| ☐ | $ |
| ☐ | $ |
| **TOTAL** | $ 0 |

IT IS UNDERSTOOD AND AGREED THAT:

☐ 1.  PREMIUM

☐ 2.  DEPOSIT PREMIUM

☐ 3.  MINIMUM PREMIUM

☐ 4.  RATE

☐ 5.  INSTALLMENT

☐ 6.  AUDIT

☐ IS CHARGED FOR THE PERIOD:

☐ 7.  COVERAGE

☐ 8.  INCEPTION DATE

☐ 9.  EXPIRATION DATE

☐ 10.  TERMS

☐ 11.  NAME OF INSURED

☒ 12.  ADDRESS OF INSURED

IS AMENDED TO READ AS FOLLOWS:

☐ 13.  COVERAGE IS CANCELLED

    ☐ SHORT RATE

    ☐ PRO RATE

    ☐ MINIMUM PREMIUM APPLIES

☐ 14.  ADDITIONAL INSURED BUT ONLY
    AS RESPECTS THE OPERATIONS
    OF THE NAMED INSURED

"Your" mailing address is amended to the following:

210 Karen Ct., Jonesboro, AR 72405

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

BY: *Drew M.Keown*

DATE OF ISSUE:  10/13/2021

CPR 2100 (11/95)

INSURED

RLI_000280

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CHANGE ENDORSEMENT

ENDORSEMENT EFFECTIVE DATE: 12/21/2021     (12:01 a.m.)

ENDORSEMENT NUMBER: 002

INSURED NAME:
Bob Robison Commercial Flooring, Inc.

☒ ADDITIONAL PREMIUM   $ ▮▮▮▮
☐ RETURN PREMIUM   $
☐ NIL   $
☐   $
☐   $
☐   $

**TOTAL**   $ ▮▮▮▮

IT IS UNDERSTOOD AND AGREED THAT:

☒ 1. PREMIUM

☐ 2. DEPOSIT PREMIUM

☐ 3. MINIMUM PREMIUM

☐ 4. RATE

☐ 5. INSTALLMENT

☐ 6. AUDIT

☒ 7. COVERAGE

☐ 8. INCEPTION DATE

☐ 9. EXPIRATION DATE

☐ 10. TERMS

☐ 11. NAME OF INSURED

☐ 12. ADDRESS OF INSURED

☐ 13. COVERAGE IS CANCELLED
     ☐ SHORT RATE
     ☐ PRO RATE
     ☐ MINIMUM PREMIUM APPLIES

☐ 14. ADDITIONAL INSURED BUT ONLY
     AS RESPECTS THE OPERATIONS
     OF THE NAMED INSURED

☐ IS CHARGED FOR THE PERIOD:      IS AMENDED TO READ AS FOLLOWS:

"Your" policy is amended to include Contractors' Equipment coverage per the following forms which are attached and applying:

IM 7005 - Schedule Of Coverages - Contractors Equipment
IM 7000 - Contractors Equipment Coverage
IM 7034 - Tools Endorsement

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

BY: *Drew McKeown*

DATE OF ISSUE: 1/10/2022

CPR 2100 (11/95)

INSURED

RLI_000281

**AAIS**
**IM 7005 04 04**
**Page 1 of 2**

# SCHEDULE OF COVERAGES
## CONTRACTORS' EQUIPMENT

(The entries required to complete this schedule
will be shown below or on the "schedule of coverages.")

**PROPERTY COVERED**

(check one)

☐ Scheduled Equipment (Refer to Equipment Schedule)

☒ Schedule On File

|  | Limit |
|---|---|
| **Catastrophe Limit –** The most "we" pay for loss in any one occurrence is: | $301,895 |

**COVERAGE EXTENSIONS**

| Additional Debris Removal Expenses | $5,000 |
|---|---|

**SUPPLEMENTAL COVERAGES**

| Employee Tools | $5,000 |
|---|---|
| Equipment Leased or Rented From Others | $Not Covered |

Newly Purchased Equipment (check one)

| ☐ Percentage of Catastrophe Limit | % |
|---|---|
| ☒ Dollar Limit | $30,900 |
| Pollutant Cleanup and Removal | $25,000 |

Rental Reimbursement

| – Reimbursement Limit | $5,000 |
|---|---|
| – Waiting Period | 72 hours |
| Spare Parts and Fuel | $5,000 |

INSURED

RLI_000282

**AAIS**
**IM 7005 04 04**
**Page 2 of 2**

## COINSURANCE

(check one)

☒ 80%  ☐ 90%  ☐ 100%  ☐ Other      %

## REPORTING CONDITIONS

(check if applicable)

☐ **Equipment Leased or Rented From Others**

   – Reporting Rate                       $

   – Deposit Premium               $

   – Minimum Premium            $

## VALUATION

(check if applicable)

☒ Actual Cash Value    ☐ Replacement Cost

☐ Indicated on Equipment Schedule

## DEDUCTIBLE

(check one)

☒ Flat Deductible Amount            $1,000

☐ Percentage Deductible               %

   Maximum Deductible Amount      $

   Minimum Deductible Amount      $

## OPTIONAL COVERAGES AND ENDORSEMENTS

---

**IM 7005 04 04**

Copyright, American Association of Insurance Services, Inc. 2004

INSURED

RLI_000283

Policy Number: ILM0303051                                RLI Insurance Company

**AAIS**
**IM 7000 04 04**
**Page 1 of 11**

# CONTRACTORS' EQUIPMENT COVERAGE

## AGREEMENT

In return for "your" payment of the required premium, "we" provide the coverage described herein subject to all the "terms" of the Contractors' Equipment Coverage. This coverage is also subject to the "schedule of coverages" and additional policy conditions relating to assignment or transfer of rights or duties, cancellation, changes or modifications, inspections, and examination of books and records.

Endorsements and schedules may also apply. They are identified on the "schedule of coverages."

Refer to Definitions for words and phrases that have special meaning. These words and phrases are shown in quotation marks or bold type.

## DEFINITIONS

1. The words "you" and "your" mean the persons or organizations named as the insured on the declarations.

2. The words "we," "us," and "our" mean the company providing this coverage.

3. "Contractors' equipment" means machinery, equipment, and tools of a mobile nature that "you" use in "your" contracting, installation, erection, repair, or moving operations or projects.

   "Contractors' equipment" also means:

   a. self-propelled vehicles designed and used primarily to carry mounted equipment; or

   b. vehicles designed for highway use that are unlicensed and not operated on public roads.

4. "Equipment schedule" means a schedule of "contractors' equipment" that is attached to this policy and that describes each piece of covered equipment.

5. "Jobsite" means any location, project, or work site where "you" are in the process of construction, installation, erection, repair, or moving.

6. "Limit" means the amount of coverage that applies.

7. "Pollutant" means:

   a. any solid, liquid, gaseous, thermal, or radioactive irritant or contaminant, including acids, alkalis, chemicals, fumes, smoke, soot, vapor, and waste. Waste includes materials to be recycled, reclaimed, or reconditioned, as well as disposed of; and

   b. electrical or magnetic emissions, whether visible or invisible, and sound emissions.

8. "Schedule of coverages" means:

   a. all pages labeled schedule of coverages or schedules which pertain to this coverage; and

   b. declarations or supplemental declarations which pertain to this coverage.

9. "Sinkhole collapse" means the sudden settlement or collapse of earth supporting the covered property into subterranean voids created by the action of water on a limestone or similar rock formation. It does not include the value of the land or the cost of filling sinkholes.

10. "Specified perils" means aircraft; civil commotion; explosion; falling objects; fire; hail; leakage from fire extinguishing equipment; lightning; riot; "sinkhole collapse"; smoke; sonic boom; vandalism; vehicles; "volcanic action"; water damage; weight of ice, snow, or sleet; and windstorm.

    Falling objects does not include loss to:

    a. personal property in the open; or

    b. the interior of buildings or structures or to personal property inside buildings or structures unless the exterior of the roofs or walls are first damaged by a falling object.

INSURED

RLI_000284

Water damage means the sudden or accidental discharge or leakage of water or steam as a direct result of breaking or cracking of a part of the system or appliance containing the water or steam.

11. "Terms" means all provisions, limitations, exclusions, conditions, and definitions that apply.

12. "Volcanic action" means airborne volcanic blast or airborne shock waves; ash, dust, or particulate matter; or lava flow.

Volcanic action does not include the cost to remove ash, dust, or particulate matter that does not cause direct physical loss to the covered property.

## PROPERTY COVERED

"We" cover the following property unless the property is excluded or subject to limitations.

1. **Scheduled Equipment –**

   a. **Coverage –** "We" cover direct physical loss caused by a covered peril to:

      1) "your" "contractors' equipment"; and

      2) "contractors' equipment" of others in "your" care, custody, or control.

   b. **Coverage Limitation –** "We" only cover "your" "contractors' equipment" and "contractors' equipment" of others:

      1) that are described on the "equipment schedule"; and

      2) when Scheduled Equipment is indicated on the "schedule of coverages."

2. **Schedule On File –**

   a. **Coverage –** "We" cover direct physical loss caused by a covered peril to:

      1) "your" "contractors' equipment"; and

      2) "contractors' equipment" of others in "your" care, custody, or control.

   b. **Coverage Limitation –** "We" only cover "your" "contractors' equipment" and "contractors' equipment" of others:

      1) that are listed in a schedule which "you" must submit to "us" and "we" keep on file, the schedule must contain a description of each item to be covered and a "limit" for each item; and

      2) when Schedule on File is indicated on the "schedule of coverages."

## PROPERTY NOT COVERED

1. **Aircraft Or Watercraft –** "We" do not cover aircraft or watercraft.

2. **Contraband –** "We" do not cover contraband or property in the course of illegal transportation or trade.

3. **Leased Or Rented Property –** "We" do not cover property that "you" lease or rent to others.

4. **Loaned Property –** "We" do not cover property that "you" loan to others.

5. **Underground Mining Operations –** "We" do not cover property while stored or operated underground in connection with any mining operations.

6. **Vehicles –** "We" do not cover automobiles, motor trucks, tractors, trailers, and similar conveyances designed for highway use and used for over the road transportation of people or cargo. However, this does not include:

   a. self-propelled vehicles designed and used primarily to carry mounted equipment; or

   b. vehicles designed for highway use that are unlicensed and not operated on public roads.

7. **Waterborne Property –** "We" do not cover property while waterborne except while in transit in the custody of a carrier for hire.

RLI_000285

**AAIS**
**IM 7000 04 04**
**Page 3 of 11**

## COVERAGE EXTENSIONS

**Provisions That Apply To Coverage Extensions** – The following Coverage Extensions indicate an applicable "limit." This "limit" may also be shown on the "schedule of coverages."

If a different "limit" is indicated on the "schedule of coverages," that "limit" will apply instead of the "limit" shown below.

However, if no "limit" is indicated for a Coverage Extension, coverage is provided up to the full "limit" for the applicable covered property unless a different "limit" is indicated on the "schedule of coverages."

Unless otherwise indicated, the coverages provided below are part of and not in addition to the applicable "limit" for coverage described under Property Covered.

The "limit" provided under a Coverage Extension cannot be combined or added to the "limit" for any other Coverage Extension or Supplemental Coverage including a Coverage Extension or Supplemental Coverage that is added to this policy by endorsement.

If coinsurance provisions are part of this policy, the following coverage extensions are not subject to and not considered in applying coinsurance conditions.

**Debris Removal –**

1. **Coverage** – "We" pay the cost to remove the debris of covered property that is caused by a covered peril.

2. **We Do Not Cover** – This coverage does not include costs to:

   a.   extract "pollutants" from land or water; or

   b.   remove, restore, or replace polluted land or water.

3. **Limit** – "We" do not pay any more under this coverage than 25% of the amount "we" pay for the direct physical loss. "We" will not pay more for loss to property and debris removal combined than the "limit" for the damaged property.

4. **Additional Limit** – "We" pay up to an additional $5,000 for debris removal expense when the debris removal expense exceeds 25% of the amount "we" pay for direct physical loss or when the loss to property and debris removal combined exceeds the "limit" for the damaged property.

5. **You Must Report Your Expenses** – "We" do not pay any expenses unless they are reported to "us" in writing within 180 days from the date of direct physical loss to covered property.

## SUPPLEMENTAL COVERAGES

**Provisions That Apply To Supplemental Coverages** – The following Supplemental Coverages indicate an applicable "limit." This "limit" may also be shown on the "schedule of coverages."

If a different "limit" is indicated on the "schedule of coverages," that "limit" will apply instead of the "limit" shown below.

However, if no "limit" is indicated for a Supplemental Coverage, coverage is provided up to the full "limit" for the applicable covered property unless a different "limit" is indicated on the "schedule of coverages."

Unless otherwise indicated, a "limit" for a Supplemental Coverage provided below is separate from, and not part of, the applicable "limit" for coverage described under Property Covered.

The "limit" available for coverage described under a Supplemental Coverage:

a.   is the only "limit" available for the described coverage; and

b.   is not the sum of the "limit" indicated for a Supplemental Coverage and the "limit" for coverage described under Property Covered.

The "limit" provided under a Supplemental Coverage cannot be combined or added to the "limit" for any other Supplemental Coverage or Coverage Extension including a Supplemental Coverage or Coverage Extension that is added to this policy by endorsement.

RLI_000286

If coinsurance provisions are part of this policy, the following supplemental coverages are not subject to and not considered in applying coinsurance conditions.

1. **Employee Tools –**

   a. **Coverage –** "We" cover direct physical loss caused by a covered peril to tools owned by "your" employees.

   b. **Coverage Limitation –** "We" only cover tools owned by "your" employees while at a:

      1) premises that "you" own or operate; or

      2) "jobsite."

   c. **Limit –** The most "we" pay in any one occurrence for loss to employee tools is $5,000.

2. **Equipment Leased Or Rented From Others –**

   a. **Coverage –** "We" cover direct physical loss caused by a covered peril to "contractors' equipment" that "you" have leased or rented from others.

   b. **Limit –** The most "we" pay in any one occurrence for equipment leased or rented from others is $25,000.

3. **Newly Purchased Property –**

   a. **Coverage –** "We" cover direct physical loss caused by a covered peril to additional "contractors' equipment" that "you" purchase during the policy period.

   b. **Limit –** The most that "we" pay for any loss under this supplemental coverage is the least of the:

      1) actual cash value of the covered property; or

      2) "limit" for newly purchased property indicated on the "schedule of coverages." If no "limit" is indicated, then 30% of the Catastrophe Limit indicated on the "schedule of coverages" applies to this coverage.

   c. **Time Limitation –** "We" extend coverage to the additional "contractors' equipment" that "you" purchase for up to 60 days.

      This supplemental coverage will end when any of the following first occur:

      1) this policy expires;

      2) 60 days after "you" obtain the additional "contractors' equipment"; or

      3) "you" report the additional "contractors' equipment" to "us."

   d. **Additional Premium –** "You" must pay any additional premium due from the date "you" purchase the additional "contractors' equipment."

4. **Pollutant Cleanup And Removal –**

   a. **Coverage –** "We" pay "your" expense to extract "pollutants" from land or water if the discharge, dispersal, seepage, migration, release, or escape of the "pollutants" is caused by a covered peril that occurs during the policy period.

   b. **Time Limitation –** The expenses to extract "pollutants" are paid only if they are reported to "us" in writing within 180 days from the date the covered peril occurs.

   c. **We Do Not Cover –** "We" do not pay the cost of testing, evaluating, observing, or recording the existence, level, or effects of "pollutants."

      However, "we" pay the cost of testing which is necessary for the extraction of "pollutants" from land or water.

   d. **Limit –** The most "we" pay for each location is $25,000 for the sum of all such expenses arising out of a covered peril occurring during each separate 12-month period of this policy.

5. **Rental Reimbursement –**

   a. **Coverage –** In the event of a direct physical loss by a covered peril to "your" "contractors' equipment," "we" reimburse "you" for "your" expense to rent similar equipment while "your" equipment is inoperable.

RLI_000287

The deductible amount indicated on the "schedule of coverages" does not apply to a loss covered under this supplemental coverage.

b. **Waiting Period** – "We" will not reimburse "you" for the rental of equipment until after the first 72-hours (unless otherwise indicated on the "schedule of coverages") following the direct physical loss to "your" "contractors' equipment" caused by a covered peril.

c. **Incurred Rental Expenses** – After the waiting period has passed, "we" will only reimburse "you" for the rental expenses that "you" actually incur.

d. **Coverage After Expiration Date** – "We" will continue to reimburse "you" for the rental of equipment after the expiration date of this coverage, provided the loss occurred before the expiration date.

e. **Coverage Limitations** – "We" will not reimburse "you":

   1) if "you" can continue or resume "your" operations with similar equipment that is available to "you" at no additional expense to "you"; or

   2) for the rental expense of any equipment unless "you" make every reasonable effort to repair, replace, or rebuild the inoperable equipment after the loss by a covered peril occurs.

f. **Limit** – The most "we" reimburse "you" in any one occurrence for rental expenses is $5,000.

6. **Spare Parts And Fuel** –

a. **Coverage** – "We" cover direct physical loss caused by a covered peril to:

   1) spare parts and accessories for "contractors' equipment"; and

   2) fluids for vehicles and "contractors' equipment"; fluids include gasoline, oil, and hydraulic fluid.

b. **Limit** – The most "we" pay in any one occurrence for loss to spare parts and accessories is $5,000.

## PERILS COVERED

"We" cover risks of direct physical loss unless the loss is limited or caused by a peril that is excluded.

## PERILS EXCLUDED

1. "We" do not pay for loss or damage caused directly or indirectly by one or more of the following excluded causes or events. Such loss or damage is excluded regardless of other causes or events that contribute to or aggravate the loss, whether such causes or events act to produce the loss before, at the same time as, or after the excluded causes or events.

a. **Civil Authority** – "We" do not pay for loss caused by order of any civil authority, including seizure, confiscation, destruction, or quarantine of property.

   "We" do cover loss resulting from acts of destruction by the civil authority to prevent the spread of fire, unless the fire is caused by a peril excluded under this coverage.

b. **Nuclear Hazard** – "We" do not pay for loss caused by or resulting from a nuclear reaction, nuclear radiation, or radioactive contamination (whether controlled or uncontrolled; whether caused by natural, accidental, or artificial means). Loss caused by nuclear hazard is not considered loss caused by fire, explosion, or smoke. Direct loss by fire resulting from the nuclear hazard is covered.

c. **War And Military Action** – "We" do not pay for loss caused by:

   1) war, including undeclared war or civil war; or

   2) a warlike action by a military force, including action taken to prevent or defend against an actual or expected attack, by any government, sovereign, or other authority using military personnel or other agents; or

RLI_000288

3) insurrection, rebellion, revolution, or unlawful seizure of power including action taken by governmental authority to prevent or defend against any of these.

With regard to any action that comes within the "terms" of this exclusion and involves nuclear reaction, nuclear radiation, or radioactive contamination, this War and Military Action Exclusion will apply in place of the Nuclear Hazard Exclusion.

2. "We" do not pay for loss or damage that is caused by or results from one or more of the following:

a. **Contamination or Deterioration** – "We" do not pay for loss caused by contamination or deterioration including corrosion, decay, fungus, mildew, mold, rot, rust, or any quality, fault, or weakness in the covered property that causes it to damage or destroy itself.

But if contamination or deterioration results in a covered peril, "we" do cover the loss or damage caused by that covered peril.

b. **Criminal, Fraudulent, Dishonest Or Illegal Acts** – "We" do not pay for loss caused by or resulting from criminal, fraudulent, dishonest, or illegal acts committed alone or in collusion with another by:

1) "you";

2) others who have an interest in the property;

3) others to whom "you" entrust the property;

4) "your" partners, officers, directors, trustees, joint venturers, or "your" members or managers if "you" are a limited liability company; or

5) the employees or agents of 1), 2), 3), or 4) above, whether or not they are at work.

This exclusion does not apply to acts of destruction by "your" employees, but "we" do not pay for theft by employees.

This exclusion does not apply to covered property in the custody of a carrier for hire.

c. **Loss Of Use** – "We" do not pay for loss caused by or resulting from loss of use, delay, or loss of market.

d. **Mechanical Breakdown** – "We" do not pay for loss caused by any mechanical, structural, or electrical breakdown or malfunction including a breakdown or malfunction resulting from a structural, mechanical, or reconditioning process.

But if a mechanical, structural, or electrical breakdown or malfunction results in a covered peril, "we" do cover the loss or damage caused by that covered peril.

e. **Missing Property** – "We" do not pay for missing property where the only proof of loss is unexplained or mysterious disappearance of covered property, or shortage of property discovered on taking inventory, or any other instance where there is no physical evidence to show what happened to the covered property.

This exclusion does not apply to covered property in the custody of a carrier for hire.

f. **Pollutants** – "We" do not pay for loss caused by or resulting from release, discharge, seepage, migration, dispersal, or escape of "pollutants":

1) unless the release, discharge, seepage, migration, dispersal, or escape is caused by a "specified peril"; or

2) except as specifically provided under the Supplemental Coverages – Pollutant Cleanup and Removal.

"We" do cover any resulting loss caused by a "specified peril."

g. **Temperature/Humidity** – "We" do not pay for loss caused by dryness, dampness, humidity, or changes in or extremes of temperature.

But if dryness, dampness, humidity, or changes in or extremes of temperature results in a covered peril, "we" do cover the loss or damage caused by that covered peril.

RLI_000289

h. **Voluntary Parting** – "We" do not pay for loss caused by or resulting from voluntary parting with title to or possession of any property because of any fraudulent scheme, trick, or false pretense.

i. **Wear And Tear** – "We" do not pay for loss caused by wear and tear, marring, or scratching.

But if wear and tear, marring, or scratching results in a covered peril, "we" do cover the loss or damage caused by that covered peril.

## WHAT MUST BE DONE IN CASE OF LOSS

1. **Notice** – In case of a loss, "you" must:

   a. give "us" or "our" agent prompt notice including a description of the property involved ("we" may request written notice); and

   b. give notice to the police when the act that causes the loss is a crime.

2. **You Must Protect Property** – "You" must take all reasonable steps to protect covered property at and after an insured loss to avoid further loss.

   a. **Payment of Reasonable Costs** – "We" do pay the reasonable costs incurred by "you" for necessary repairs or emergency measures performed solely to protect covered property from further damage by a peril insured against if a peril insured against has already caused a loss to covered property. "You" must keep an accurate record of such costs. "Our" payment of reasonable costs does not increase the "limit."

   b. **We Do Not Pay** – "We" do not pay for such repairs or emergency measures performed on property which has not been damaged by a peril insured against.

3. **Proof Of Loss** – "You" must send "us," within 60 days after "our" request, a signed, sworn proof of loss. This must include the following information:

   a. the time, place, and circumstances of the loss;

   b. other policies of insurance that may cover the loss;

   c. "your" interest and the interests of all others in the property involved, including all mortgages and liens;

   d. changes in title of the covered property during the policy period; and

   e. estimates, specifications, inventories, and other reasonable information that "we" may require to settle the loss.

4. **Examination** – "You" must submit to examination under oath in matters connected with the loss as often as "we" reasonably request and give "us" sworn statements of the answers. If more than one person is examined, "we" have the right to examine and receive statements separately and not in the presence of others.

5. **Records** – "You" must produce records, including tax returns and bank microfilms of all canceled checks relating to value, loss, and expense and permit copies and extracts to be made of them as often as "we" reasonably request.

6. **Damaged Property** – "You" must exhibit the damaged and undamaged property as often as "we" reasonably request and allow "us" to inspect or take samples of the property.

7. **Volunteer Payments** – "You" must not, except at "your" own expense, voluntarily make any payments, assume any obligations, pay or offer any rewards, or incur any other expenses except as respects protecting property from further damage.

8. **Abandonment** – "You" may not abandon the property to "us" without "our" written consent.

9. **Cooperation** – "You" must cooperate with "us" in performing all acts required by this policy.

## VALUATION

1. **Actual Cash Value** – The value of covered property will be based on the actual cash value at the time of the loss (with a deduction for depreciation) unless replacement cost is indicated on the "schedule of coverages."

RLI_000290

2. **Replacement Cost** – The value of covered property will be based on the replacement cost without any deduction for depreciation unless Actual Cash Value is indicated on the "schedule of coverages."

   a. **Replacement Cost Limitation** – The replacement cost is limited to the cost of repair or replacement with similar materials and used for the same purpose. The payment will not exceed the amount "you" spend to repair or replace the damaged or destroyed property.

   b. **Replacement Cost Does Not Apply Until Repair Or Replacement** – Replacement cost valuation does not apply until the damaged or destroyed property is repaired or replaced.

   c. **Time Limitation** – "You" may make a claim for actual cash value before repair or replacement takes place, and later for the replacement cost if "you" notify "us" of "your" intent within 180 days after the loss.

3. **Pair Or Set** – The value of a lost or damaged article which is part of a pair or set is based on a reasonable proportion of the value of the entire pair or set. The loss is not considered a total loss of the pair or set.

4. **Loss To Parts** – The value of a lost or damaged part of an item that consists of several parts when it is complete is based on the value of only the lost or damaged part or the cost to repair or replace it.

## HOW MUCH WE PAY

1. **Insurable Interest** – "We" do not cover more than "your" insurable interest in any property.

2. **Flat Deductible** – "We" pay only that part of "your" loss over the deductible amount indicated on the "schedule of coverages" in any one occurrence unless Percentage Deductible is indicated on the "schedule of coverages."

3. **Percentage Deductible** – When a percentage deductible is indicated on the "schedule of coverages," "we" pay only that part of "your" loss over the deductible amount as determined below.

   a. **Determining The Deductible Amount** – The deductible amount is determined by applying the percentage indicated on the "schedule of coverages" to the value of the covered property that is involved in the loss. The value is determined by the provisions described under the Valuation section of this policy.

   b. **Two Or More Items** – If a loss involves two or more pieces of equipment, the percentage indicated on the "schedule of coverages" will apply only to the covered property with the highest value.

   c. **Minimum and Maximum Deductible** – The percentage deductible will not exceed the Maximum Deductible amount and will not be less than the Minimum Deductible amount indicated on the "schedule of coverages."

4. **Loss Settlement Terms** – Subject to paragraphs 1., 2., 3., 5., 6., and 7. under How Much We Pay, "we" pay the lesser of:

   a. the amount determined under Valuation;

   b. the cost to repair, replace, or rebuild the property with material of like kind and quality to the extent practicable; or

   c. the "limit" that applies to the covered property. However, the most "we" pay for loss in any one occurrence is the Catastrophe Limit indicated on the "schedule of coverages."

5. **Coinsurance** –

   a. **When Coinsurance Applies** – "We" only pay a part of the loss if the "limit" is less than the percentage of the value of the covered property that is indicated on the "schedule of coverages."

   b. **How We Determine Our Part Of The Loss** – "Our" part of the loss is determined using the following steps:

      1) multiply the percent indicated on the "schedule of coverages" by the value of the covered property at the time of loss;

RLI_000291

2) divide the "limit" for covered property by the result determined in b.1) above;

3) multiply the total amount of loss, after the application of any deductible, by the result determined in b.2) above.

The most "we" pay is the amount determined in b.3) above or the "limit," whichever is less. "We" do not pay any remaining part of the loss.

c. **If There Is More Than One Limit** – If there is more than one "limit" indicated on the "schedule of coverages" for this coverage part, this procedure applies separately to each "limit."

d. **If There Is Only One Limit** – If there is only one "limit" indicated on the "schedule of coverages" for this coverage, this procedure applies to the total of all covered property to which the "limit" applies.

e. **When Coinsurance Does Not Apply** – Conditions for coinsurance do not apply unless a coinsurance percentage is indicated on the "schedule of coverages."

6. **Insurance Under More Than One Coverage** – If more than one coverage of this policy insures the same loss, "we" pay no more than the actual claim, loss, or damage sustained.

7. **Insurance Under More Than One Policy** –

a. **Proportional Share** – "You" may have another policy subject to the same "terms" as this policy. If "you" do, "we" will pay "our" share of the covered loss. "Our" share is the proportion that the applicable "limit" under this policy bears to the "limit" of all policies covering on the same basis.

b. **Excess Amount** – If there is another policy covering the same loss, other than that described above, "we" pay only for the amount of covered loss in excess of the amount due from that other policy, whether "you" can collect on it or not. But "we" do not pay more than the applicable "limit."

## LOSS PAYMENT

1. **Loss Payment Options** –

a. **Our Options** – In the event of loss covered by this coverage form, "we" have the following options:

1) pay the value of the lost or damaged property;

2) pay the cost of repairing or replacing the lost or damaged property;

3) rebuild, repair, or replace the property with other property of equivalent kind and quality, to the extent practicable, within a reasonable time; or

4) take all or any part of the property at the agreed or appraised value.

b. **Notice Of Our Intent To Rebuild, Repair, Or Replace** – "We" must give "you" notice of "our" intent to rebuild, repair, or replace within 30 days after receipt of a duly executed proof of loss.

2. **Your Losses** –

a. **Adjustment And Payment Of Loss** – "We" adjust all losses with "you." Payment will be made to "you" unless another loss payee is named in the policy.

b. **Conditions For Payment Of Loss** – An insured loss will be payable 30 days after:

1) a satisfactory proof of loss is received, and

2) the amount of the loss has been established either by written agreement with "you" or the filing of an appraisal award with "us."

3. **Property Of Others** –

a. **Adjustment And Payment of Loss To Property of Others** – Losses to property of others may be adjusted with and paid to:

RLI_000292

1) "you" on behalf of the owner; or

2) the owner.

b. **We Do Not Have To Pay You If We Pay The Owner** – If "we" pay the owner, "we" do not have to pay "you." "We" may also choose to defend any suits brought by the owners at "our" expense.

## REPORTING CONDITIONS

**Equipment Leased Or Rented From Others** – If indicated on the "schedule of coverages," the following reporting conditions apply.

1. **Reports** –

   a. **You Will Report To Us** – Within 30 days after the end of the policy period, "you" will report to "us" the total amount of "your" expenditures for "contractors' equipment" that "you" lease or rent from others.

   b. **Cancellation** – If this policy is canceled, "you" will report the total amount of expenditures up to and including the date of cancellation.

2. **Premium Computation And Adjustment** –

   a. The premium will be adjusted at the end of the policy period. The total computed premium will be determined by multiplying "your" total equipment expenditures by the reporting rate indicated on the "schedule of coverages" for Equipment Leased or Rented From Others.

   b. "We" will compare the total computed premium to the deposit premium. If it is more than the deposit premium, "you" will pay "us" the difference. If it is less than the deposit premium, "we" will pay "you" the difference subject to the minimum premium indicated on the "schedule of coverages."

3. **Provisions That Affect How Much We Pay** – The following provisions apply to reports that are submitted and may affect How Much We Pay:

   a. **Failure To Submit Reports** – If "you" have failed to submit the required reports or no report has been submitted, the most "we" will pay is 90% of the "limit."

b. **Reported Values Are Less Than The Full Value** – If "your" last report before a loss shows less than the actual value of "your" expenditures for "contractors' equipment" that "you" lease or rent from others, "we" will only pay a part of the loss. "We" will not pay a greater portion of the loss, prior to the application of the deductible, than the total expenditures "you" reported divided by "your" actual expenditures for "contractors' equipment" that "you" lease or rent from others during the reporting period.

c. **We Will Not Pay More Than The Limit** – "We" will not pay more than the applicable "limit" regardless of any reported value used in computing the premium.

## OTHER CONDITIONS

1. **Appraisal** – If "you" and "we" do not agree on the amount of the loss or the value of covered property, either party may demand that these amounts be determined by appraisal.

   If either makes a written demand for appraisal, each will select a competent, independent appraiser and notify the other of the appraiser's identity within 20 days of receipt of the written demand. The two appraisers will then select a competent, impartial umpire. If the two appraisers are unable to agree upon an umpire within 15 days, "you" or "we" can ask a judge of a court of record in the state where the property is located to select an umpire.

   The appraisers will then determine and state separately the amount of each loss.

   The appraisers will also determine the value of covered property items at the time of the loss, if requested.

   If the appraisers submit a written report of any agreement to "us," the amount agreed upon will be the amount of the loss. If the appraisers fail to agree within a reasonable time, they will submit only their differences to the umpire. Written agreement so itemized and signed by any two of these three, sets the amount of the loss.

RLI_000293

Each appraiser will be paid by the party selecting that appraiser. Other expenses of the appraisal and the compensation of the umpire will be paid equally by "you" and "us."

2. **Benefit to Others** – Insurance under this coverage will not directly or indirectly benefit anyone having custody of "your" property.

3. **Conformity With Statute** – When a condition of this coverage is in conflict with an applicable law, that condition is amended to conform to that law.

4. **Estates** – This provision applies only if the insured is an individual.

   a. **Your Death** – On "your" death, "we" cover the following as an insured:

      1) the person who has custody of "your" property until a legal representative is qualified and appointed; or

      2) "your" legal representative.

      This person or organization is an insured only with respect to property covered by this coverage.

   b. **Policy Period Is Not Extended** – This coverage does not extend past the policy period indicated on the declarations.

5. **Misrepresentation, Concealment, Or Fraud** – This coverage is void as to "you" and any other insured if, before or after a loss:

   a. "you" or any other insured have willfully concealed or misrepresented:

      1) a material fact or circumstance that relates to this insurance or the subject thereof; or

      2) "your" interest herein.

   b. there has been fraud or false swearing by "you" or any other insured with regard to a matter that relates to this insurance or the subject thereof.

6. **Policy Period** – "We" pay for a covered loss that occurs during the policy period.

7. **Recoveries** – If "we" pay "you" for the loss and lost or damaged property is recovered, or payment is made by those responsible for the loss, the following provisions apply:

   a. "you" must notify "us" promptly if "you" recover property or receive payment;

   b. "we" must notify "you" promptly if "we" recover property or receive payment;

   c. any recovery expenses incurred by either are reimbursed first;

   d. "you" may keep the recovered property but "you" must refund to "us" the amount of the claim paid or any lesser amount to which "we" agree; and

   e. if the claim paid is less than the agreed loss due to a deductible or other limiting "terms" of this policy, any recovery will be pro rated between "you" and "us" based on "our" respective interest in the loss.

8. **Restoration Of Limits** – A loss "we" pay under this coverage does not reduce the applicable "limit" unless it is a total loss to a scheduled item. In the event of a total loss to a scheduled item, "we" refund the unearned premium on that item.

9. **Subrogation** – If "we" pay for a loss, "we" may require "you" to assign to "us" "your" right of recovery against others. "You" must do all that is necessary to secure "our" rights. "We" do not pay for a loss if "you" impair this right to recover.

   "You" may waive "your" right to recover from others in writing before a loss occurs.

10. **Suit Against Us** – No one may bring a legal action against "us" under this coverage unless:

    a. all of the "terms" of this coverage have been complied with; and

    b. the suit has been brought within two years after "you" first have knowledge of the loss.

       If any applicable law makes this limitation invalid, then suit must begin within the shortest period permitted by law.

11. **Territorial Limits** – "We" cover property while it is in the United States of America, its territories and possessions, Canada, and Puerto Rico.

Copyright, American Association of Insurance Services, 2004

**AAIS**
**IM 7034 06 04**
**Page 1 of 1**

This endorsement changes the
Contractors' Equipment Coverage
**-- PLEASE READ THIS CAREFULLY --**

# TOOLS ENDORSEMENT

(The entries required to complete this endorsement
will be on the "schedule of coverages.")

## SCHEDULE

**Limit**

1. **Your Tools –**

   a. The most "we" pay for loss to any one "tool" is:     $ 2,500

   b. The most "we" pay in any one occurrence
   for loss to "your" "tools" is:     $ 10,000

**Deductible**

Deductible Amount $ 1,000

## ADDITIONAL DEFINITIONS

"Tools" means equipment, and tools of a mobile nature
that "you" use in "your" contracting, installation, erection,
repair, or moving operations or projects.

## SUPPLEMENTAL COVERAGES

1. **Your Tools –** "We" cover direct physical loss caused
   by a covered peril to "your" "tools."

## HOW MUCH WE PAY

**Tools Deductible –** "We" pay only that part of "your" loss
over the deductible amount indicated for "tools."

IM 7034 06 04

Copyright, American Association of Insurance Services, Inc., 2004

RLI_000295

EXHIBIT HART-2

**To:**       New Claim[New.Claim@rlicorp.com]
**Cc:**       Lee Jackson[leej@cashionco.com]
**From:**     Erin Garner
**Sent:**     Mon 1/24/2022 3:38:14 PM
**Subject:**  Bob Robison Commercial Flooring, Inc., ILM0303051
ACORD Form 20220124-093525.pdf

……
Please find new Installation Floater claim for you to handle.

Thanks!

Erin Garner ~ Claims ~ The Cashion Company, Inc.

The Cashion Company Insurance and Bonding, LLC 321 Scott Street ~ Little Rock ~ AR ~ 72201

Phone: 501.975.9988 ~ fax: 501.376.2118 email: ering@cashionco.com ~ website: www.cashionco.com

Receipt of e-mail by any employee of The Cashion Co., Inc. does not constitute an agreement to bind, write, or revise coverage. This communication, together with any attachments hereto or links contained herein, is for the sole use of the intended recipient(s) and may contain information that is confidential or legally protected. If you are not the intended recipient, you are hereby notified that any review, disclosure, copying, dissemination, distribution, or use of this communication is STRICTLY PROHIBITED. If you have received this communication in error, please notify the sender immediately by return e-mail message and delete the original and all copies of the communication, along with any attachments hereto or links herein, from your system

RLI_000002

# ACORD®

## PROPERTY LOSS NOTICE

**DATE (MM/DD/YYYY)**
12/17/2021

| AGENCY | INSURED LOCATION CODE | DATE OF LOSS AND TIME | |
|---|---|---|---|
| The Cashion Company Insurance and Bonding | | 12/13/2021 | ☒ AM ☐ PM |
| P.O. Box 550 | | **PROPERTY / HOME POLICY** | |

| | | | | |
|---|---|---|---|---|
| Little Rock | AR 72203 | **CARRIER** RLI Insurance Company | | **NAIC CODE** 13056 |

**CONTACT NAME:**

**POLICY NUMBER** ILM0303051 | **LINE OF BUSINESS**

**PHONE (A/C, No, Ext):** (501) 376-0716

**FAX (A/C, No):** (501) 376-2118

**FLOOD POLICY**

**E-MAIL ADDRESS:** ering@cashionco.com

**CARRIER** | **NAIC CODE**

**CODE:** | **SUBCODE:**

**AGENCY CUSTOMER ID:** 00003017

**POLICY NUMBER**

**WIND POLICY**

**CARRIER** | **NAIC CODE**

**POLICY NUMBER**

## INSURED

**NAME OF INSURED (First, Middle, Last)**
Bob Robison Commercial Flooring, Inc.

**INSURED'S MAILING ADDRESS**
210 Karen Ct.

| **DATE OF BIRTH** | **FEIN (If applicable)** 465597137 | **MARITAL STATUS / CIVIL UNION (if applicable)** | Jonesboro | AR 72401 |
|---|---|---|---|---|

**PRIMARY PHONE #** ☐ HOME ☒ BUS ☐ CELL
(870) 935-1064

**SECONDARY PHONE #** ☐ HOME ☐ BUS ☐ CELL

**PRIMARY E-MAIL ADDRESS:**

**SECONDARY E-MAIL ADDRESS:**

**NAME OF SPOUSE (First, Middle, Last) (if applicable)**

**SPOUSE'S MAILING ADDRESS (if applicable)**

| **DATE OF BIRTH** | **FEIN (If applicable)** | **MARITAL STATUS / CIVIL UNION (if applicable)** |
|---|---|---|

**PRIMARY PHONE #** ☐ HOME ☐ BUS ☐ CELL

**SECONDARY PHONE #** ☐ HOME ☐ BUS ☐ CELL

**PRIMARY E-MAIL ADDRESS:**

**SECONDARY E-MAIL ADDRESS:**

## CONTACT          CONTACT INSURED

**NAME OF CONTACT (First, Middle, Last)**
BOB ROBINSON

**CONTACT'S MAILING ADDRESS**

**PRIMARY PHONE #** ☒ HOME ☐ BUS ☐ CELL
(870) 931-8500

**SECONDARY PHONE #** ☐ HOME ☐ BUS ☐ CELL

**WHEN TO CONTACT**

**PRIMARY E-MAIL ADDRESS:** bob.robison@robisonflooring.com

**SECONDARY E-MAIL ADDRESS:**

## LOSS

**LOCATION OF LOSS**
**STREET:** TRUMANN MIDDLE SCHOOL GYM

**POLICE OR FIRE DEPARTMENT CONTACTED**
NONE

**CITY, STATE, ZIP:** TRUMANN          AR

**REPORT NUMBER**

**COUNTRY:**

**DESCRIBE LOCATION OF LOSS IF NOT AT SPECIFIC STREET ADDRESS:**

| **KIND OF LOSS** | FIRE | LIGHTNING | FLOOD | ☒ Installation Floater | **PROBABLE AMOUNT ENTIRE LOSS** |
|---|---|---|---|---|---|
| | THEFT | HAIL | WIND | | 150,000.00 |

**DESCRIPTION OF LOSS & DAMAGE (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)**

INSURED INSTALLED A GYM FLOOR /COURT ON A JOB AND HIRED THE SUB, ROBERT LYLES PARKING LOT SERVICES, TO PAINT THE MARKINGS ON THE FLOOR. THE MARKINGS WERE INCORRECT AND THERE WERE  LARGE PAINT DROPS ALL OVER THE FLOOR THAT COUDLN'T BE REMOVED.     FLOOR HAD TO BE RIPPED UP AND A NEW ONE LAID DOWN .

**REPORTED BY**
BOB ROBINSON

**REPORTED TO**
ERIN GARNER

The ACORD name and logo are registered marks of ACORD

RLI_000003

AGENCY CUSTOMER ID: 00003017

**REMARKS (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)**

**Applicable in Alabama:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or who knowingly presents false information in an application for insurance is guilty of a crime and may be subject to restitution, fines, or confinement in prison, or any combination thereof.

**Applicable in Alaska:** A person who knowingly and with intent to injure, defraud, or deceive an insurance company files a claim containing false, incomplete, or misleading information may be prosecuted under state law.

**Applicable in Arizona:** For your protection Arizona law requires the following statement to appear on this form. Any person who knowingly presents a false or fraudulent claim for payment of a loss is subject to criminal and civil penalties.

**Applicable in Arkansas:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**Applicable in California:** For your protection California law requires the following to appear on this form. Any person who knowingly presents false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

**Applicable in Colorado:** It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

**Applicable in Delaware:** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, files a statement of claim containing any false, incomplete or misleading information is guilty of a felony.

**Applicable in the District of Columbia:** WARNING: It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant.

**Applicable in Florida:** Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

**Applicable in Idaho:** Any person who knowingly, and with intent to defraud or deceive any insurance company, files a statement containing any false, incomplete or misleading information is guilty of a felony.

**Applicable in Indiana:** A person who knowingly and with intent to defraud an insurer files a statement of claim containing any false, incomplete, or misleading information commits a felony.

**Applicable in Kansas:** Any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written, electronic, electronic impulse, facsimile, magnetic, oral, or telephonic communication or statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which such person knows to contain materially false information concerning any fact material thereto; or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act.

**Applicable in Kentucky:** Any person who knowingly and with intent to defraud any insurance company or other person files a statement of claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

**Applicable in Louisiana:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**Applicable in Maine:** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines or denial of insurance benefits.

**Applicable in Maryland:** Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

RLI_000004

**Applicable in Michigan:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**Applicable in Minnesota:** A person who files a claim with intent to defraud or helps commit a fraud against an insurer is guilty of a crime.

**Applicable in Nevada:** Pursuant to NRS 686A.291, any person who knowingly and willfully files a statement of claim that contains any false, incomplete or misleading information concerning a material fact is guilty of a category D felony.

**Applicable in New Hampshire:** Any person who, with a purpose to injure, defraud or deceive any insurance company, files a statement of claim containing any false, incomplete or misleading information is subject to prosecution and punishment for insurance fraud as provided in RSA 638:20.

**Applicable in New Jersey:** Any person who knowingly files a statement of claim containing any false or misleading information is subject to criminal and civil penalties.

**Applicable in New York:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

**Applicable in New Mexico:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to civil fines and criminal penalties.

**Applicable in Ohio:** Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

**Applicable in Oklahoma:** WARNING: Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

**Applicable in Oregon:** Any person who knowingly and with intent to defraud or solicit another to defraud the insurer by submitting an application containing a false statement as to any material fact may be violating state law.

**Applicable in Pennsylvania:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

**Applicable in Puerto Rico:** Any person who knowingly and with the intention of defrauding presents false information in an insurance application, or presents, helps, or causes the presentation of a fraudulent claim for the payment of a loss or any other benefit, or presents more than one claim for the same damage or loss, shall incur a felony and, upon conviction, shall be sanctioned for each violation by a fine of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), or a fixed term of imprisonment for three (3) years, or both penalties. Should aggravating circumstances be present, the penalty thus established may be increased to a maximum of five (5) years, if extenuating circumstances are present, it may be reduced to a minimum of two (2) years.

**Applicable in Rhode Island:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**Applicable in Tennessee:** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.

**Applicable in Texas:** Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

**Applicable in Virginia:** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.

**Applicable in Washington:** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.

**Applicable in West Virginia:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

RLI_000005

EXHIBIT HART-3



**RLI INSURANCE COMPANY**

CLAIM DEPARTMENT: P.O. BOX 3961 • PEORIA, IL 61612-3961
UPS/FEDEX: 9025 N. LINDBERGH DR • PEORIA, IL 61615-1431
P 800-444-0406
F 866-692-6796
RLICORP.COM

February 22, 2022

**Via E-Mail:** <u>bob.robison@robisonflooring.com</u>
**And Certified Mail 9214 8969 0099 9790 1641 9087 21 Return Receipt Requested**

Bob Robison Commercial Flooring, Inc.
Attn: Bob Robison
210 Karen Ct.
Jonesboro, AR 72405

|  |  |
|---|---|
| Insured: | Bob Robison Commercial Flooring, Inc. |
| Policy No.: | ILM0303051 – effective dates 06/11/2021-06/11/2022 |
| DOL: | 12/13/2021 |
| RLI Claim No.: | 00506309 |
| Re: | Damaged Basketball Court |

Mr. Robison,

RLI Insurance Company ("RLI") acknowledges receipt of claim submitted on January 24, 2021 advising that basketball court flooring located at 221 N Pine Ave, Trumann, AR 72472 suffered damages due to the subcontractor, Robert Liles Parking Lot Services ("Liles Parking"), on or about December 13, 2021. This acknowledgement is made subject to a full reservation of rights. We have completed our investigation with regard to this claim and we regret to inform you there is no coverage under the RLI policy referenced above.

Based on the information provided, you were contracted to install an athletic floor with basketball and volleyball line markings at 211 N Pine Ave, Trumann, AR 72472. After laying the floor, you subcontracted the painting of basketball and volleyball lines to Liles Parking. Liles Parking reportedly did subpar work. Lines were reportedly not properly spaced, painted poorly, and paint was spilled in multiple areas. It is our understanding that as the floor is a vinyl flooring product, the paint permanently bonds to the floor and cannot be removed. As a result, the floor reportedly must be removed and replaced at a cost of $159,030.50. It is our understanding that replacement work has already begun at this time. Based on the information provided, this claim was reported to Liles Parking's general liability carrier, who reportedly declined coverage due to a work product exclusion.

At this time, we write to point out certain provisions in the policy in effect Bob Robison Commercial Flooring, Inc. and RLI on the date of loss which may be relevant to the claim and which may ultimately be the basis upon which coverage for this matter may be limited or declined. Policy ILM0303051, with effective dates of 06/11/2021-06/11/2022, provides Installation Floater Coverage. The policy provides, in part, as follows:

***PROPERTY COVERED***

RLI INSURANCE COMPANY

*"We" cover only the following property and only to the extent the property is not otherwise excluded or subject to limitations.*

1. ***Coverage -- "We" cover direct physical loss or damage caused by a covered peril to:***

a. *"your" materials, supplies, fixtures, machinery, or equipment; and*

b. *similar property of others that is in "your" care, custody, or control while at "your" "jobsite" and that "you" are installing, constructing, or rigging as part of an "installation project". ...*

\*\*\*

***PERILS COVERED***

*"We" cover risks of direct physical loss or damage unless the loss is limited or caused by a peril that is excluded.*

\*\*\*

***PERILS EXCLUDED***

2. "We" do not pay for loss or damage that is caused by or results from one or more of the following:

   d. **Defects, Errors, Or Omissions In Property --**
   "We" do not pay for loss or damage caused by or resulting from inherent defects, errors, or omissions in covered property (whether negligent or not) relating to:

   1) design or specifications;

   2) workmanship or construction; or

   3) repair, renovation, or remodeling.

      But if a defect, error or omission as described above results in a covered peril, "we" do cover the loss or damage caused by that covered peril.

\*\*\*

Based on the information provided, it is not clear that the improper and poor-quality painting of the basketball and volleyball lines constitutes direct physical loss or damage to the basketball floor at issue. To the extent that the improper and poor-quality painting completed by Liles Painting does qualify as direct physical loss or damage, exclusion d. cited above excludes coverage for loss or damage caused by errors in covered property due to workmanship. Based on the above, there is

RLI_000046

RLI INSURANCE COMPANY

therefore no coverage for this claim under the RLI policy. We will proceed to close our file at this time.

This letter is based on the investigation conducted to date and the information we have at this time and is not an exhaustive listing of all of the terms, conditions, exclusions or limitations of the insurance policies that might bar or limit RLI's obligations in this matter. There may be other facts and circumstances, as well as other policy provisions, which would further serve to relieve RLI of any duty to provide a defense or indemnity. Therefore, please be advised that this correspondence should not be deemed or construed as a waiver of any of the rights and defenses available to RLI, including but not limited to those rights and defenses provided under the policy of insurance, or at law.

Should you disagree with our coverage analysis or have additional facts or legal authority which you believe is relevant to the coverage analysis, please forward that additional information to me for review.

If you wish to discuss this matter in additional detail please do not hesitate to contact me. I can be reached at 404-315-9515 x1056 or Anthony.Hart@rlicorp.com.

Sincerely,

*Anthony Hart*

Anthony Hart
RLI Insurance Company


cc:     **Via Regular Mail:**
        The Cashion Co Ins & Bonding
        PO Box 550
        321 Scott Street
        Little Rock, AR 72203

3

RLI_000047

**To:**　　'bob.robison@robisonflooring.com'[bob.robison@robisonflooring.com]
**From:**　Lisa van Lanen
**Sent:**　Tue 2/22/2022 8:22:54 PM
**Subject:**　RLI 506309 Bob Robison Commercial Flooring, Inc
Denial Letter.pdf

Claim No.　　00506309

Insured Name:　　BOB ROBISON COMMERCIAL FLOORING, INC.

Please find the attached letter from Anthony Hart.

Please contact Anthony Hart directly should you have questions.

anthony.hart@rlicorp.com
404-315-9515　　Ext: 1056
Click here to enter text.　　Fax


　**RLI Correspondence Tracking Token: Please do not alter or remove**
[CHcJZnC01iAkSchbAr8o3/UcdzAUIgnwHU8AhS8fVbjkn6wJgkDL+HJXlsCtdIh6fLbj6fohuXA=]
**End of Token**

RLI_000048

**Certified Mail service provides the following benefits:**
■ A receipt (this portion of the Certified Mail label).    for an electronic return receipt, see a retail
■ A unique identifier for your mailpiece

Batch #:   9
Article #:  9214896900999790 1641908721
Date/Time:                 **RECEIVED**
Code: 506309

**FEB 2 3 2022**

Internal File #:      CLAIM DEPARTMENT
Internal Code:

- Return receipt service, which provides a record of delivery (including the recipient's signature). You can request a hardcopy return receipt or an electronic version. For a hardcopy return receipt, complete PS Form 3811, Domestic Return Receipt; attach PS Form 3811 to your mailpiece;

present your Certified Mail item at a post Office™ for postmarking. If you don't need a postmark on this Certified Mail receipt, detach the barcoded portion of this label, affix it to the mailpiece, apply appropriate postage, and deposit the mailpiece.

PS Form 3800, April 2015 (reverse) PSN 7530-02-000-9047    IMPORTANT: Save this receipt for your records

RLI_000049

**Certified Mail service provides the following benefits:**

■ A receipt (this portion of the Certified Mail label).    for an electronic return receipt, see a retail

Batch #:   9
Article #:  92148969009997901641908721

**RECEIVED**

Date/Time:
Code: 506309

**FEB 2 3 2022**

Internal File #:    CLAIM DEPARTMENT
Internal Code:

─ Return receipt service, which provides a record of delivery (including the recipient's signature). You can request a hardcopy return receipt or an electronic version. For a hardcopy return receipt, complete PS Form 3811, *Domestic Return Receipt*; attach PS Form 3811 to your mailpiece;

present your Certified Mail item at a post Office™ for postmarking. If you don't need a postmark on this Certified Mail receipt, detach the barcoded portion of this label, affix it to the mailpiece, apply appropriate postage, and deposit the mailpiece.

PS Form 3800, April 2015 *(reverse)* PSN 7530-02-000-9047    IMPORTANT: Save this receipt for your records

RLI_000050

Date Produced: 02/28/2022

RLI INSURANCE:

The following is the delivery information for Certified Mail™/RRE item number 9214 8969 0099 9790 1641 9087 21. Our records indicate that this item was delivered on 02/26/2022 at 12:22 p.m. in JONESBORO, AR 72405. The scanned image of the recipient information is provided below.

Signature of Recipient :

Address of Recipient :

Thank you for selecting the Postal Service for your mailing needs.  If you require additional assistance, please contact your local post office or Postal Service representative.

Sincerely,
United States Postal Service

The customer reference number shown below is not validated or endorsed by the United States Postal Service. It is solely for customer use.

Customer Reference Number:        506309

RLI_000051

EXHIBIT HART-4

RECEIVED

MAR 1 0 2022

CLAIM DEPARTMENT

 **NEWLAND**
**•  Attorneys at Law  •**

2228 Cottondale Lane
Suite 220
Little Rock, AR 72202
501.221.9393
**newlandassociatespllc.com**

**Writer's Contact Information:**
jbcross@newlandassociatespllc.com
(501)221-9393/Fax (501) 221-7058

SCANNED MAR 10 '22

March 4, 2022

Anthony Hart
RLI Insurance Company
P.O. BOX 3961
Peoria, IL 61612-3961

RE:    Project:    Truman Middle School Gym Main Gym Athletic Floor
    Contractor:    Nabholz Construction Services, Inc.
    Subcontractor/Insured:    Bob Robison Commercial Flooring, Inc.
    Sub-Subcontractor:    RLPLS, LLC / Robert Liles Parking Lot Services
    Policy No.:    ILM0303051 – effective dates 06/11/2021-06/11/2022
    RLI Claim No.:    00506309 Re: Damaged Basketball Court

Dear Hart:

    Our firm represents Bob Robison Commercial Flooring, Inc. a subcontractor to Nabholz construction Company for the above project. I have been asked to respond to your letter of February 22, 2022. I have had a chance to review the policy as well as your letter. You summarized the facts. Bob Robison Commercial Flooring, Inc. [BRCF] subcontracted the vinyl floor to a gym and the stripping for the floor. BRCF in turn hired Robert Liles Parking Lot Services to do the strip painting on top of the vinyl floor. The striping was applied negligently, as you state. The misapplication damaged the underlying floor which is being removed and replaced.

    You do appear to have included the proper language from the policy in your letter, but I believe that your conclusion is not correct on these facts. I understand that the policy would not cover the replacement of the defective striping itself, but the coverage we seek is for the underlying vinyl floor. The coverage language you quote "*b. similar property of others that is in "your" care, custody, or control while at "your" "jobsite" and that "you" **are installing** constructing, or rigging as part of an "installation project"*. In this case the vinyl flooring once affixed to the building is the property of others that is being installed. Under Perils Excluded, damage resulting from defective or negligent '*workmanship or construction*' would not be covered. There is however and exception. "*But if a defect, error or omission as described above results in a covered peril, "we" do cover the loss or damage caused by that covered peril.*" The cost to redo the striping is not covered but this defective work resulted in a covered peril, which is the damage to the vinyl flooring which must be replaced. There was no defect or workmanship issue with the vinyl and its replacement was due only to the damage from the striping. Your conclusion that the poor-quality painting did not constitute a direct physical loss or damage to

RLI_000052

Newland & Associates
J B Cross, Jr.
March 4, 2022
Page - 2 -

the floor is not supported by the plain reading of the policy. This is an interpretation of the RLI
policy that the courts have already rejected. In RLI Ins. Co. v. Willbros Constr. (U.S.) LLC, 2011
U.S. Dist. LEXIS 115100 a similar interpretation was rejected by that court. The insured in that
instance had a project that required a 'line pipe' to be installed under a river by passing through a
hole under the river. The insured in that case contended:

> "The defendants contend that the policy covers the line pipe's value, and that even
> if the hole was defectively drilled, the resulting damage to the line pipe is a
> covered loss that is not otherwise excluded."

RLI in that case contended that there was no coverage because:

> "the hole through which the line pipe was to be installed was defectively drilled.
> It maintains that the "ensuing loss" provision does not extend coverage to the
> defendants' claim because there was no separate and independent "covered peril"
> beyond the faulty construction that caused the loss."

This is the same argument RLI now advances, that the flooring damage resulted from the
negligent striping. But the court rejected this contention and grated partial summary judgment.
The opinion is based on the same language in the policy as in this case. The court reasoned:

> "In effect, the exclusion eliminates coverage for the repair or replacement of
> defective workmanship while preserving coverage for damage that results from
> that defective workmanship."

The court then held that:

> "Accordingly, the Court finds that the line pipe is covered property. Consequently,
> even if the hole was defectively drilled, the resulting damage to the line pipe is a
> covered loss of property separate and distinct from the allegedly defective hole."

The striping itself is not covered, but the damage resulting from the striping to the underlying
floor is covered property.

RLI can satisfy itself that the replacement costs in fact do not include the replacement of
the defective striping, but the language of the policy allows coverage for the damage to the vinyl
flooring. This based on the language of the policy itself and a court's interpretation of that
language. Please provide coverage for this loss as required by the terms of the Equipment and
Installation Floater.

RLI_000053

Newland & Associates
J B Cross, Jr.
March 4, 2022
Page - 3 -

Sincerely,
NEWLAND & ASSOCIATES, PLLC

Junius Bracy Cross, Jr.

RLI_000054



2228 Cottondale Lane
Suite 220
Little Rock, AR 72202
501.221.9393

• Attorneys at Law • newlandassociatespllc.com





FIRST-CLASS

US POSTAGE
02 1P    $ 000.53⁰
0001192013    MAR 04 2022
MAILED FROM ZIP CODE 72202

Anthony Hart
RLI Insurance Company
Post Office Box 3961
Peoria, IL 61612-3961

# EXHIBIT HART-5



**A PROFESSIONAL CORPORATION**
**ATTORNEYS AND COUNSELORS**

2001 BRYAN STREET, SUITE 1800
DALLAS, TEXAS 75201

GREG K. WINSLETT                                                                                          Phone: (214) 880-1870
gwinslett@qslwm.com                                                                                        Fax:   (214) 871-2111

May 31, 2022

Junius Bracy Cross, Jr.—*Via Email jbcross@newlandassociatespllc.com*
Newland & Associates, PLLC
2228 Cottondale Lane
Little Rock, Arkansas 72202

|       |            |                                               |
|-------|------------|-----------------------------------------------|
| Re:   | Policy No: | ILM0303051 (the "Policy")                     |
|       | Insured:   | Bob Robison Commercial Flooring, Inc.         |
|       | DOL:       | 12/31/2021                                    |
|       | Claim No:  | 00506309 (the "Claim")                        |
|       | Claimant:  | Bob Robison Commercial Flooring, Inc.         |

Dear Mr. Cross,

RLI Insurance Company ("RLI") has asked that I respond to your March 4, 2022 letter requesting RLI reconsider its denial of coverage for the Claim. After reviewing your correspondence, RLI must maintain its position regarding the denial of coverage for the reasons explained in RLI's February 22, 2022 letter to the Insured. That letter contains a thorough recitation of the undisputed facts, so those facts will not be restated here.

As RLI has previously explained, even if the improper painting completed by your subcontractor Robert Liles Parking Lot Services ("RLPLS") somehow constitutes direct physical loss or damage (which RLI denies), the Claim is still excluded from coverage under the following Policy exclusion:

**PERILS EXCLUDED**

. . . .

2.  "We" do not pay for loss or damage that is caused by or results from one or more of the following:

    . . .

    d.  **"Defects, Errors, Or Omissions In Property"** – "We" do not pay for loss or damage caused by or resulting from inherent defects, errors, or omissions in covered property (whether negligent or not) relating to:

RLI_000240

Page 2

    1)  design or specifications;

    2)  workmanship or construction; or

    3)  repair, renovation, or remodeling.

But if a defect, error or omission as described above results in a covered peril, "we" do cover the loss or damage caused by that covered peril.

The reported damage to the vinyl flooring was caused by errors related to workmanship and is, therefore, excluded under Exclusion 2.d. quoted above.

In your March 4, 2022 letter, you do not dispute that Exclusion 2.d. applies in this instance. Rather, you contend that the exception to Exclusion 2.d. is triggered because the RLPLS's faulty workmanship somehow resulted in a covered peril. As part of that argument, you contend that the damage to the vinyl flooring is somehow covered because there was no workmanship issue with the vinyl, which was only damaged by the improperly applied striping. Your letter cites a single, unreported case, RLI v. Willbros Construction, 2011 WL 4729866 (S.D. Tex. Oct. 5, 2011), to support this misguided proposition. As explained below, your interpretation is not supported by the plain language of the exception, and the ruling in Willbros is totally contrary to more recent precedent from the Fifth Circuit.

First, the plain language of the exception (which courts have commonly referred to as an "ensuing loss" provision) requires a separate, distinct "covered peril" that results from the loss caused by the error in workmanship. The Claim in this matter, therefore, would not trigger the exception because there is no separate, distinct "covered peril" or loss sustained as a result of the damage to the vinyl flooring caused by the improperly installed paint.

This reading of the exception is supported by Balfour Beatty Constr., L.L.C. v. Liberty Mut. Fire Ins. Co., 968 F.3d 504, 511–12 (5th Cir. 2020), a recent decision of the United States Court of Appeals for the Fifth Circuit (applying Texas law) involving the same exclusion. The court held:

> As the cases below demonstrate, an ensuing loss provision like the one presented here is only triggered when one (excluded) peril results in a distinct (covered) peril, meaning there must be **two separate events** for the Exception to trigger. Put simply, Appellants' welding operation involved falling slag, which damaged the exterior glass of Energy Center 5. The welding operation is inseparable from the falling slag; they are not two separate events. The falling slag is not an independent event that "resulted in a covered peril." Instead, the falling slag during the welding operation constituted damage, caused by an act of construction or installation, to the exterior glass. Further, even if the falling slag is separable from the welding operation, it is not a "covered peril." Under the Policy, Appellants' claim is not covered because it falls within the Exclusion.

(emphasis added). Here, just like in Balfour Beatty quoted above, there was only one event—the negligent paint application—which damaged the vinyl flooring. There was no separate, distinct

Page 3

covered peril that resulted from the faulty painting, so the exception to the Faulty Work Exclusion was not triggered, and there is no coverage for the Claim.

The court's reasoning in the outlier case you cited, Willbros, is not only contrary to the plain language of the Policy, it is almost impossible to follow. Not surprisingly, Willbros has never been followed or even cited by any court in the country. Balfour Beatty is much more logical and instructive than Willbros. It was decided by a higher court and, unlike Willbros, the reasoning follows the actual language of the exclusion and the exception. Furthermore, the facts here resemble Balfour Beatty, not Willbros. In Willbros, the hole for the pipe was negligently drilled, and then the pipe was damaged when it was installed in the negligently drilled hole. In this Claim, by contrast, there was only one act. The negligently applied paint cannot be separated from the damaged vinyl flooring. The damage occurred instantaneously as a result of the same act of faulty workmanship, just like the welding slag damage in Balfour Beatty.

For these reasons, RLI must reaffirm its decision to deny coverage for the Claim. Lastly, RLI has advised us that you have filed suit so, quite obviously, an appropriate responsive pleading consistent with this analysis will be filed shortly.

Sincerely,

Greg K. Winslett

cc:    Richard L. Smith, III / firm
       Anthony Hart – Anthony.Hart@rlicorp.com

EXHIBIT

# RLI-MSJ 2

TO

**DEFENDANT'S STATEMENT OF MATERIAL FACTS**

**AND ANNEX TO MOTION FOR SUMMARY JUDGMENT**

**(May 18, 2023, Plaintiff Deposition Transcript Excerpts)**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION

CIVIL ACTION NO. 3:22-cv-150-KGB

_____

BOB ROBISON COMMERCIAL FLOORING,
INC.,

        Plaintiff,

V.

RLI INSURANCE COMPANY,

        Defendant.
_____

----------------------------------------------------
30(B)(6) DEPOSITION
VIA ZOOM VIDEOCONFERENCE OF
BOB ROBISON COMMERCIAL FLOORING, INC.
(BOB ROBISON)
----------------------------------------------------

TAKEN MAY 18, 2023         BY CARA NASI-PINARDI, RPR



```
 1   ZOOM APPEARANCES:

 2   NEWLAND & ASSOCIATES, PLLC
     2228 Cottondale Lane
 3   Suite 220
     Little Rock, AR  72202
 4   Phone:  501-221-9393
     Email:  Jbcross@newlandassociatespllc.com
 5   By Mr. Junius Bracy Cross, Jr.
         Counsel for Plaintiff
 6

 7   QUILLING, SELANDER, LOWNDS, WINSLETT & MOSER, P.C.
     2001 Bryan Street
 8   Suite 1800
     Dallas, TX  75201
 9   Phone:  214-871-2100
     Email:  Jbirch@qslwm.com
10   By Mr. James H. Birch
         Counsel for Defendant
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                    I N D E X

 2    EXAMINATION BY MR. BIRCH, PAGE 5

 3

 4                  INDEX OF EXHIBITS

 5    NUMBER/DESCRIPTION

 6               *EXHIBITS WERE PREMARKED*

 7    1 - Notice of Deposition for Bob Robison Commercial
          Flooring, Inc.
 8
      2 - RLI Policy 2021 0611 for Bob Robison Commercial
 9        Flooring, Inc.

10    5 - 2021 0528 Email McKeown to Cashion Co

11    6 - 2021 0528 Ltr RLI to Cashion Co Ins & Bonding

12    7 - 2021 0528 Ltr RLI to Cashion Co Ins & Bonding

13    8 - 2021 0602 Ltr RLI to Cashion Co Ins & Bonding

14    11- 0001 2021 04 08 Trumann Gym Athletic Flooring
          Bid to Nabholz Bob Robison Comm 20230507 161605
15
      14- 0005 Liles Nabholz Bob Robison Comm 20230507
16        162323

17    15- 2021 1213 RLPLS LLC Cert of Liability Insurance

18    16- 2021 1213 Property Loss Notice

19    17- 0009 Emails A Hart RLI Ins L Jackson with
          Pictures of Liles Damage Bob Robison
20        Comm 20230507 163917

21    19- 2022 0127 Email Robison to Hart

22    21- 0007 Emails to Cashion Lee Jackson and Sammy
          Moore adjuster December 21 and Jan 22 Bob
23        Robison Comm 20230507 163047

24

25
```



1              INDEX OF EXHIBITS CONTINUED

2    NUMBER/DESCRIPTION

3    22 - 2022 0127 Email Robison to Hart sending photos

4    23 - 2022 0127 Email Robison to Hart sending photos

5    24 - 2022 0127 Email Robison to Hart sending photos

6    25 - 2022 0127 Email Robison to Hart

7    26 - 2022 0127 Email Robison to Hart

8    27 - 2022 0214 Email Hart to Robison

9    28 - 2022 0214 Email Hart to Robison

10   29 - Trumann paint damage 8 color photos

11   31 - 2022 0222 Ltr RLI to Robison

12   32 - 2022 0223 Certified Mail Receipt

13   33 - 2022 0226 Certified Mail Delivered

14   37 - 0012 Complaint - Final filed

15   38 - 0013 - Summons - Lile (1)

16   40 - Signed Default Judgment

17   41 - 0017 16JCV-22-914.AmendedDJ_0001

18   45 - 0006 Management of Trumann Replacement

19

20

21

22

23

24

25



```
 1   THE DEPOSITION OF BOB ROBISON IS TAKEN ON THIS 18TH

 2   DAY OF MAY, 2023, VIA ZOOM VIDEOCONFERENCE,

 3   COMMENCING AT 9:25 A.M.

 4

 5              (WHEREUPON, BOB ROBISON WAS DULY SWORN.)

 6

 7                     EXAMINATION

 8   BY MR. BIRCH:

 9   Q   Mr. Robison, my name is Jim Birch.  We just met a

10       few seconds ago.

11   A   Yes, sir.

12   Q   I represent RLI Insurance group who is the defendant

13       in this case.  The purpose of us being here today is

14       for me to take your deposition both -- well, in the

15       official capacity as the owner and I guess president

16       of Bob Robison Commercial Flooring.

17   A   And I'm actually the vice president.

18   Q   Vice president.  Okay.  Good enough.  And have you

19       ever given a deposition before, sir?

20   A   Yes, sir.

21   Q   Okay.  All I ask is listen to my questions, and if

22       you don't understand one, please allow me to restate

23       it or rephrase it so that you do, and if you answer

24       a question, I'm going to assume that you understood

25       it and that you tried to answer it to the best of
```

1       your ability.  Is that fair?

2   A   That's fair.

3   Q   Good deal.  Mr. Robison, tell me a little bit about

4       your background.  Let's kind of start with your

5       education if you don't mind.

6   A   I attended the University of Washington in Seattle

7       from 1964 or '63 to '67.  I was a young married

8       person and had two children and ran out of money.

9       So I was like 20 credits from graduating from there.

10      My father wanted me to come back into the business,

11      and that was 1967.

12          So I came back into the business with him.

13      That was residential retail out of Springfield,

14      Missouri, working with him at Midwest Rug.  He had

15      opened a business here in Jonesboro in 1957.  We had

16      a manager here that was stealing from us.  So I came

17      here in 1970, took over the management here in

18      Jonesboro of Midwest Rug.

19          Then we opened up Bob Robison Commercial

20      Flooring in 1997, because I had always been doing

21      commercial work through that period of time, and we

22      have been in business since that time.  We work in

23      several states.  I work in Georgia, Alabama,

24      Mississippi, Texas, a lot of work in Texas recently,

25      and Missouri, all large commercial work.

BOB ROBISON  30(b)(6)                                        May 18, 2023
BOB ROBISON COMMERCIAL FLOORING V. RLI                            14

1       Liles' work?

2   A   Actually, there was no communications between myself

3       and Trumann Schools direct.

4   Q   Okay.  Did all of that go through Nabholz?

5   A   All of that went through Nabholz.

6   Q   Okay.  Did you have any dealings with the

7       architecture firm?  I think it was Mr. Steel.

8   A   No, that's with the Jeff Steiling.

9   Q   Jeff Steiling, sorry.

10  A   Now, verbally, yes, on the project, yes.

11  Q   Okay.

12  A   But primarily my communication goes from myself to

13      the general contractor, Gary Hoyt.  He was the

14      project manager on this.  Those communications go to

15      the architect and the architect takes it to the

16      owner keeping the chain of command.

17  Q   Okay.  Is there any other event other than Liles'

18      improper application of the painting that you allege

19      is a cause of damage to the floor at the Trumann

20      gym?

21  A   Let me -- I don't quite understand the question.

22      Are you asking me, was there any other damage to the

23      floor other than done by Mr. Liles?

24  Q   Yes, sir.  That's correct.

25  A   That's correct.



1    you're wanting to talk about is numbered at the

2    bottom BRCF206.

3  A   Of course I don't have these marked the way you do.

4  Q   Okay.

5  A   My communication starts regarding that issue on

6    Friday, December 10th, at 10:00 a.m.

7              MR. CROSS:  Bob, if you look -- didn't

8    your grandson print those pages out?

9  BY MR. BIRCH:

10  Q   Let me share my screen with you so that you can see

11    it again.

12  A   Yeah, that's the same one I'm looking at, Jim.

13  Q   Okay.  Good deal.  If you don't mind, my printout

14    didn't come out completely clear, but it looks like

15    it's from Gary Hoyt.  This particular email message

16    is from Gary Hoyt to you, and he has got Grissom,

17    Shrable and Vance all on that?

18  A   Yes.

19  Q   And he says, I need to talk to you about the Trumann

20    project on Monday morning.

21  A   Yes.

22  Q   Is that the first you heard about there being an

23    issue with the Trumann flooring installation?

24  A   Yes, to my knowledge.  Now, if you'll back up to the

25    previous correspondence between Bradley Grissom on



```
 1        December 9th.
 2   Q    Right.
 3   A    He sent me a notice at that time called an issue
 4        report, issue 15 center court.
 5   Q    Okay.
 6   A    That was the first notice from Nabholz that I had.
 7   Q    Okay.  And on the 9th, what was Mr. Grissom asking
 8        you about?  Was it something about the logo?
 9   A    No.  Primarily -- and I don't have his full
10        commentary on there.  My memory tells me that he
11        sent me an issue report then on center court, and
12        this was sent at 3:30 in the afternoon.  So I did
13        not go down at that time to take a look at it.  He
14        didn't go into definition to my knowledge at that
15        time on that.  He just said we have an issue.
16   Q    Okay.  So let me go back to the email correspondence
17        from Mr. Hoyt on December 10.  It looks like he sent
18        that around 10:00 that morning.  Is that right?
19   A    Yes.
20   Q    Okay.  And in that -- let me highlight this if you
21        don't mind if I can find something to highlight it
22        with.  Never mind.  Let me just kind of point to you
23        with the pointer here.  Mr. Hoyt writes, "I have
24        major problems with the floor stripes, and I will
25        add it to the list of problems we have and are
```



1       having on this project with your flooring."

2              What other issues did they have with the

3       flooring other than the painting?

4    A  He's referring to "I am not happy at all.  The main

5       gym floor is" -- and I'm just going to have to read

6       this.

7    Q  Yeah, read through it, but just that sentence seems

8       to imply that there were other issues that he was

9       adding to this list.

10   A  I don't know that I would interpret it that way.  "I

11      am not happy at all" -- because I'm not aware of any

12      issues.  "I am not happy at all.  The main gym floor

13      is the most important part of the entire project and

14      now we have to figure out how to make this floor

15      correct, but the problems is not just the Wildcat

16      logo and the center markings.  The lines bleed and

17      most lines have a crook in them.  They are not

18      perfectly straight.  The three-point lines around

19      the corners are too narrow, and the black paint is

20      not finished.  It goes around the floor to bleachers

21      and from entry end to wall and other end to this

22      transition."

23              I'm thinking that his general phrasing there

24      implied something else was wrong, but to my

25      knowledge, there wasn't.  I'm trying to think of



1   anything else that might have been an issue.  This

2   was the major issue.

3 Q  Okay.  So to your knowledge, there wasn't any other

4   problem with the flooring.  It was level.  Is that

5   correct?

6 A  Correct.

7 Q  The floor surface was not overly slick or overly

8   sticky so it could be used as a gymnasium floor?

9 A  Yeah, the floor before Mr. Liles put his lines on it

10   was in perfect condition.

11 Q  Okay.  And so the only issue with the floor was the

12   paint that was applied to it and couldn't be

13   removed?

14 A  You're correct.

15 Q  Okay.  Sorry, my phone system is ringing through.  I

16   forgot to put the do not disturb sign on it.  I

17   don't know if you could hear that or not.

18 A  No, Jim.

19 Q  Okay.  Good.  Well, if it's not bothering you.

20 A  Go ahead, sir.

21 Q  If it doesn't bother you, then I'm good.

22 A  It's not bothering me at all, sir.

23 Q  All right.  Sorry about that.  So had you been to

24   inspect the painting before you received this email

25   from Mr. Hoyt on the 13th?



BOB ROBISON  30(b)(6)                                May 18, 2023
BOB ROBISON COMMERCIAL FLOORING V. RLI              21

1    A    If you'll please repeat that.

2    Q    Yes.  Prior to receiving the email on December 10

3         from Mr. Hoyt, had you been down to inspect the

4         painting that was done on the flooring?

5    A    No, sir.

6    Q    Okay.  Who was I guess your project manager for this

7         particular installation project?

8    A    Well, it would have been Mr. Liles for that phase of

9         the contract.

10   Q    Okay.  Do you know if Mr. Liles had inspected the

11        flooring before December 10?

12   A    Yeah, he was physically -- he and his

13        daughter-in-law were physically doing the work.

14   Q    Okay.  And prior to him beginning the work, was he

15        given a schematic or a drawing showing where the

16        lines were and what dimensions?

17   A    Yeah, there was a lot of communication starting --

18        bear with me a minute -- starting April 8th up

19        through, oh, I would say I think just before he set

20        up the -- I think it was at -- it was at middle to

21        end of November.  It was before Thanksgiving that we

22        were doing the final ordering of paint for the

23        floors and getting everything lined up and ready for

24        him to start on the 29th of November.

25   Q    Okay.  Let me scroll down.  It looks like Mr. Hoyt



```
 1        it had been changed.

 2   Q    Okay.

 3   A    Now, in the notes here I realize now Jeff Steiling,

 4        the architect was there at that meeting in addition

 5        to the primary people from Nabholz.

 6   Q    Okay.  So describe for me what the conversation was

 7        during your meeting with Nabholz and the architect

 8        on December 13th.

 9   A    Well, we went through the details of the lines being

10        incorrect to make a summary.  The three-point line

11        was too narrow.  It was outlined incorrectly.  The

12        volleyball lines didn't square up with the

13        free-throw line.  Most of the lines had fuzzy paint

14        running under.  I'm not a game line person, so I'm

15        just telling you from my observation and from

16        talking to the person who we hired to come in and

17        redo the new floor we put down.

18             They explained to me that whoever put the

19        masking tape down was -- that masking tape is

20        designed to keep the border straight and keep the

21        lines from flowing underneath the masking tape, so

22        it has to be put down correctly or you get that

23        bleed underneath the masking tape.  So it was just

24        not applied correctly.

25   Q    Okay.
```



```
 1   A   Or squarely.  I mean, there were so many defects in
 2       the floor at that point in time in the painting that
 3       could not replace the original.
 4   Q   Okay.  When did you first learn that the painting
 5       would require the floor to be replaced?
 6   A   At that meeting.  Well, I knew from past knowledge
 7       that once they put a primer down on that floor, they
 8       put their masking tape down to establish the lines.
 9       Then they put a primer down in order to lock in the
10       paint to the floor.  That paint also has an adhering
11       quality to it.  Now, I believe it -- and I know it's
12       an epoxy paint.  So when they put that paint on the
13       floor, it's not designed to come up ever.
14   Q   Okay.  How did it come about that Mr. Liles'
15       company, I think it's called Robert Liles Parking
16       Lot Signage.  How is it that you selected RLPLS to
17       do the painting on this project?
18   A   Well, we had done the Pocahontas project with
19       Nabholz a couple years before this, and I believe it
20       was through a painting contractor in Texas -- or,
21       yeah, whoever we bought the paint from for that
22       project, I was given several references and
23       Mr. Liles was one of those references.  I got
24       several bids at that time from those various
25       references.
```



1    negligent or not) relating to: design or

2    specifications; workmanship or construction; or

3    repair, renovation, or remodeling.  But if a defect,

4    error or omission as described above results in a

5    covered peril, we do cover the loss or damage caused

6    by that covered peril."

7         So other than the misapplication of the paint,

8    was there another peril that caused damage to this

9    floor?

10   A    No.

11   Q    Okay.  So the only peril to the floor was Mr. Liles'

12   paint job?

13   A    That's correct.

14   Q    Okay.  And the reason for having to remove the floor

15   was because it did not meet the design or

16   specifications required by the contractor and

17   general contractor and the architect.  Is that

18   correct?

19   A    Your phrasing is a little bit tilted, if I may say.

20   Q    All right.  Well, I don't mean to put words into

21   your mouth.  Let me know what you mean.

22   A    My basic -- and I don't really understand this

23   particular clause because it's inherently vague.

24   The defects, errors, or omissions was to the paint,

25   not the floor.  So we wouldn't be asking my



1    end of January, which had to be postponed until

2    later in the year.

3  Q   Very well.  Now, isn't it true though that what you

4    contracted with Nabholz to provide was an installed

5    floor with the striping and the logo in place

6    according to the specs?

7  A   Yes.

8  Q   Okay.  And you were responsible for making sure that

9    the floor and the striping met the specifications?

10  A   Yes.

11  Q   Okay.  And the reason the floor and the striping

12    that was your contractual obligation to provide did

13    not meet the specifications was because of the poor

14    workmanship of your subcontractor.  Is that correct?

15  A   That's correct.

16  Q   Okay.  And so it's not like the paint job caused

17    some other problem with the floor.  The problem was

18    the paint job itself.  Isn't that correct?

19  A   Yeah, phrase that again, please.

20  Q   The problem with the floor was the paint job itself.

21    It didn't cause any other type of problem with the

22    flooring, did it?

23  A   No, I mean, the paint job was the reason why the

24    floor was rejected.

25  Q   Okay.  Let me go to -- if you'll pardon me for just



1       a minute while I fumble around again.  Let me pull
2       up Exhibit 16 for a second.  There we go.  I find
3       that when I get too many documents on my screen it
4       doesn't share properly.
5   A   Generally, I wouldn't be in your business for any
6       amount of money.
7   Q   Well, you know, it used to be the good old days.  I
8       was talking to my paralegal about this.  We used to
9       just put all our exhibits in a box and carry them to
10      the deposition and pull them out in paper form.
11      Nothing is simple anymore.  Anyway, I'm being an old
12      curmudgeon.  I'm not going to complain about it
13      anymore.
14  A   Well, you're in the middle of a whole bunch of old
15      curmudgeons.  Sorry, JB.
16  Q   Mr. Robison, I pulled up Exhibit 16, which I believe
17      is the property loss notice that was submitted on
18      your claim.  It looks like it was submitted
19      12/13/2021.
20  A   Yes, uh-huh.
21  Q   Is that when Mr. Jackson submitted it to RLI?
22  A   I don't have any personal knowledge of that, but
23      that looks like it took place through his operation.
24  Q   Okay.  And in the description of the loss it says,
25      "Insured installed a gym floor/court on a job and



1          hired the sub, Robert Liles Parking Lot Services, to

2          paint the markings on the floor.  The markings were

3          incorrect and there were large paint drops all over

4          the floor that couldn't be removed.  Floor had to be

5          ripped up and a new one laid down."

6               Is that a good description of the loss?

7    A    Yes.

8    Q    Okay.  Is that a description that you provided to

9         Mr. Jackson?

10   A    You know, sir, that's my general conversation with

11        him, yes.

12   Q    Okay.  Have you seen this document before?

13   A    No, sir.  As I said, this type of document would

14        come to my wife, Nancy.

15   Q    Okay.

16   A    Through the mail or it might have come from me

17        through an email, but I don't have a record of it in

18        my email chain.  If I do, it was overlooked.

19   Q    Okay.  Give me just a second here.  At some point

20        did you have a conversation with Anthony Hart from

21        RLI?

22   A    I did.

23   Q    Okay.  I'm going to go pull up Exhibit 17 real

24        quick.

25   A    I haven't looked at that recently.  Oh, yeah, here



BOB ROBISON  30(b)(6)                                    May 18, 2023
BOB ROBISON COMMERCIAL FLOORING V. RLI                        53

1    Q    Okay.

2    A    We're not asking for coverage for his work product.

3    Q    Okay.  And you understood that RLI was not insuring

4         your work product.  Is that correct?

5    A    They're not insuring my work product because it was

6         not defective.

7    Q    Okay.  And they weren't insuring -- this wasn't a

8         performance bond where they were paying if you

9         didn't perform according to the specifications, was

10        it?

11   A    No, there was no performance and payment bond on the

12        project.

13   Q    Okay.  And isn't it also true that RLI did not issue

14        a policy to you that basically gave warranties for

15        all of the work that you performed?

16   A    No, and that is not the issue.

17   Q    Okay.  So let me continue this analogy for a minute.

18        When you bid on the project to Nabholz, you bid on

19        installing the floor and the striping.  Is that

20        correct?

21   A    That's correct.

22   Q    And then you would have change orders to install the

23        floors on the second gymnasium, the PE gymnasium.

24        Is that correct?

25   A    Yes.



BOB ROBISON  30(b)(6)                          May 18, 2023
BOB ROBISON COMMERCIAL FLOORING V. RLI         54

```
 1  Q   And as part of those change orders or as an

 2      additional change order, you had the change order to

 3      have the logo painted on the main gym floor.  Is

 4      that right?

 5  A   Correct.

 6  Q   So the work product that you were supposed to

 7      deliver to Nabholz and Trumann Schools was the floor

 8      installed and properly painted.  Is that correct?

 9  A   Correct.

10  Q   Okay.  So if it was not properly painted and you had

11      to redo the painting, that would not be covered by

12      the policy, would it?

13  A   We're not asking them to cover the painting.

14  Q   Okay.

15  A   It was not the painting that the claim is about.

16           MR. CROSS:  Let me interpose for the

17      record.  We can ask Mr. Robison all the questions

18      you want about coverage, but just for purposes of

19      litigation, we are not bound in any of our arguments

20      on the policy by anything in the argument that he

21      does or doesn't make.

22           MR. BIRCH:  Sure.  But I'm not asking

23      him arguments.  I'm asking him facts about --

24           MR. CROSS:  Then I'm fine with that.

25           MR. BIRCH:  -- what he contracted for
```



1        and what he was obligated to provide.

2                    MR. CROSS:  Yeah, that's fine.  That's

3        fine.

4   BY MR. BIRCH:

5   Q   Mr. Robison, just to be clear, you contracted to

6        provide the installed vinyl floor properly painted

7        to the school district.  Is that correct?

8   A   Yes.

9   Q   And the work product or the project work that you

10       were supposed to provide was the installed floor

11       painted according to specifications?

12  A   Correct.

13  Q   Okay.  And the only reason the floor was rejected

14       and had to be torn out was because it did not meet

15       the specifications.  Is that correct?

16  A   Correct, yes.

17  Q   Okay.  And that was due to the workmanship of your

18       subcontractor, Mr. Liles?

19  A   Correct.

20  Q   Give me just a second here to thumb through some

21       exhibits again.  I'm going to show you what we've

22       marked as Exhibit 11 to your deposition,

23       Mr. Robison.  One second.  Let me see if I can get

24       it pulled up.  Can you see that on your screen now,

25       Mr. Robison?



BOB ROBISON  30(b)(6)                                     May 18, 2023
BOB ROBISON COMMERCIAL FLOORING V. RLI                   56

1   A   Yes, sir.

2   Q   Okay.  And it looks like this is the bid form that

3       you submitted on April 8 of 2021.  Is that correct?

4   A   Yes, correct.

5   Q   And it was bid package number 8, which is the

6       athletic flooring.  Is that correct?

7   A   Yes.

8   Q   And you bid $117,897?

9   A   Correct.

10  Q   And then the logo add was $3,333.  Is that right?

11  A   Correct, yeah.

12  Q   And it looks like they did ask at least initially

13      for some bonding information, and you identified

14      McDaniel Whitley as your surety agent.  Do you see

15      that?

16  A   That's correct, yes, at that time.

17  Q   Okay.

18  A   I didn't recall just when I switched, but that's

19      correct at that time.

20  Q   Okay.  Let me scroll to the next page which is part

21      of 21 that's labeled BRCF119.  This is just a

22      submission of the bid where you agreed to keep the

23      proposal valid for 60 days.  Is that correct?

24  A   Yes.

25  Q   Okay.  Let me scroll down to the next page, which



BOB ROBISON  30(b)(6)                                    May 18, 2023
BOB ROBISON COMMERCIAL FLOORING V. RLI                          61

```
 1      are all the bid documents that you have on the
 2      Trumann gym project.  Is that right?
 3   A  That's part of them, yes.  That's the major portion
 4      of it, yes.
 5   Q  Okay.  And this diagram on BRCF127 is the diagram
 6      that shows the dimensions of the floors and the
 7      painting striping?
 8   A  The lines, yes.
 9   Q  Okay.  So what you -- just to clarify again, what
10      you bid on was to install the floor and provide the
11      striping and logo.  Is that right?
12   A  Correct, yes.
13   Q  Okay.  And that was to be the work product that was
14      to be produced as part of this -- under this
15      contract?
16   A  Correct.
17   Q  Okay.  Let me flip to Exhibit 22, if you don't mind,
18      Mr. Robison.  One second.  This looks like the
19      emails that you -- one of the emails where you sent
20      photographs to Mr. Hart on January 27.
21   A  Yes.
22   Q  And I know these are not really good reproductions,
23      and I've got clearer images I think on down the road
24      here.
25   A  I am following, yes, sir.
```



 1   A   Right.

 2   Q   And it looks like you're also asking for draw threes

 3       to help you with the cash flow to get through this

 4       thing a little bit.  Did they give you the third

 5       draw?

 6   A   No, in fact, they held up payment on all projects of

 7       our projects I had with them until this project was

 8       completed and they were happy.  So not only did they

 9       hold up payment on the Trumann, but they held up

10       payment on other projects.

11   Q   Okay.

12   A   At one time owed us $200,000.  It was sitting out

13       there because they felt like they had to have that

14       in their back pocket as insurance to make sure I was

15       able and successful to replace it.

16   Q   Okay.  Have you installed any more sports floors

17       since you did the Trumann project?

18   A   Yes.

19   Q   Where else?

20   A   Arkansas Center for Independence in Newport.

21   Q   Okay.  Any others?

22   A   No, that's it.

23   Q   Okay.  It looks like in this email you keep

24       referring to this as being like a tornado or a

25       natural disaster.  Was it just because it was



1        unexpected that you considered it to be that way?

2    A   I think I was referring to it as a complete

3        surprise.

4    Q   Okay.  Okay.  But it's -- it wasn't a natural

5        disaster?

6    A   It was a disaster.

7    Q   Okay.  It was just a failure of the workmen to do

8        the job the way they were supposed to do it, wasn't

9        it?

10   A   I would say that's a fair statement with that

11       specific subcontractor, yeah.

12   Q   Okay.

13                MR. BIRCH:  Tell you what, if we can

14       take another 10-minute break, I may be able to wrap

15       this up before noon, gentlemen.

16            (Off the record at 11:49 a.m.)

17            (Back on the record at 11:52 a.m.)

18   BY MR. BIRCH:

19   Q   Let me show you the last two exhibits I'm going to

20       show you today, Mr. Robison.

21   A   You mean we're that close?

22   Q   Well, I'm not going to make promises, but we're

23       pretty close.

24   A   Okay.

25   Q   So let me pull these up.



BOB ROBISON  30(b)(6)                                      May 18, 2023
BOB ROBISON COMMERCIAL FLOORING V. RLI                          84

```
1        So some of that was dealt with and probably some it

2        was not.

3   Q    Okay.  After having sat through the deposition and

4        taking a break or so, are there any questions that

5        upon reflection you think you didn't understand when

6        you originally answered them?

7   A    Well, of course there are that we have a

8        disagreement with you, but the fact of the matter

9        is, I understood most of your questions, and I did

10        not agree with, you know, some of the interpretation

11        of what I think should be covered as opposed to what

12        you're thinking should be covered.

13   Q    Okay.  But you've understood my questions, and

14        you've tried to answer them to the best of your

15        ability, haven't you?

16   A    Yes, yes.

17   Q    Okay.  And you've answered them truthfully?

18   A    Yes.

19   Q    Okay.  And there is really no dispute as to the

20        facts, is there, as far as --

21   A    What you call facts and what I call facts are

22        different.

23   Q    Let me run through what I think are some facts we

24        can agree with.  First of all, you bid on and

25        contracted to provide a certain project to Nabholz
```



BOB ROBISON  30(b)(6)                              May 18, 2023
BOB ROBISON COMMERCIAL FLOORING V. RLI                      85

1          and the Trumann School District.  Is that correct?

2     A    Correct, yeah.

3     Q    And that project included redoing or installing new

4          sports flooring in the main gymnasium and in what

5          they call the back gymnasium.  Is that correct?

6     A    Right, uh-huh.

7     Q    And along with the installation of the flooring, you

8          were to provide the game striping and the logo

9          painting as part of your work product.  Is that

10         correct?

11    A    That's correct.

12    Q    And you subcontracted the portion of your work

13         product dealing with the painting of the striping

14         and the logo to Robert Liles Parking Lot Services.

15         Is that correct?

16    A    That's correct.

17    Q    And Robert Liles Parking Lot Services did not paint

18         the lines in a workmanlike manner and as a result,

19         your work product was rejected by Nabholz.  Is that

20         correct?

21    A    Correct, yep.

22    Q    But other than the painting that was done in an

23         unworkmanlike manner, there was no other issues with

24         the floor.  It was level.  It did not have any

25         blisters.  It did not have any defects other than



1        the painting.  Is that correct?

2    A   That's correct.

3    Q   Okay.  I have no further questions for you,

4        Mr. Robison.  Thank you for your time.

5    A   Nice to visit with you, Jim.  Good luck to you.  No,

6        I'm not going to say good luck to you.

7    Q   Fair enough.

8                  MR. BIRCH:  JB, I didn't meant to cut

9        you off.

10                 MR. CROSS:  No, no, I have no -- this is

11       a formal part, Bob.  No, I don't have any questions.

12        (The deposition concluded at 12:02 p.m.)

13                      *END OF RECORD*

14

15

16

17

18

19

20

21

22

23

24

25



```
1   STATE OF MINNESOTA

2                                       CERTIFICATE

3   COUNTY OF WASHINGTON

4

5        I, CARA NASI-PINARDI, HEREBY CERTIFY THAT I
    REPORTED THE DEPOSITION VIA ZOOM VIDEOCONFERENCE OF
6   BOB ROBISON ON THE 18TH DAY OF MAY, 2023, AND THAT
    THE WITNESS WAS BY ME FIRST DULY SWORN TO TELL THE
7   TRUTH AND NOTHING BUT THE TRUTH CONCERNING THE
    MATTER IN CONTROVERSY AFORESAID;
8
         THAT I WAS THEN AND THERE A NOTARY PUBLIC IN
9   AND FOR THE COUNTY OF WASHINGTON, STATE OF
    MINNESOTA; THAT BY VIRTUE THEREOF I WAS DULY
10  AUTHORIZED TO ADMINISTER AN OATH;

11       THAT THE FOREGOING TRANSCRIPT IS A TRUE AND
    CORRECT TRANSCRIPT OF MY STENOGRAPHIC NOTES IN SAID
12  MATTER, TRANSCRIBED UNDER MY DIRECTION AND CONTROL;

13       THAT THE COST OF THE ORIGINAL HAS BEEN CHARGED
    TO THE PARTY WHO NOTICED THE DEPOSITION AND THAT ALL
14  PARTIES WHO ORDERED COPIES HAVE BEEN CHARGED AT THE
    SAME RATE FOR SUCH COPIES;
15
         THAT THE READING AND SIGNING OF THE DEPOSITION
16  WAS WAIVED;

17       THAT I AM NOT RELATED TO ANY OF THE PARTIES
    HERETO, NOR INTERESTED IN THE OUTCOME OF THE ACTION
18  AND HAVE NO CONTRACT WITH ANY PARTIES, ATTORNEYS OR
    PERSONS WITH AN INTEREST IN THE ACTION THAT HAS A
19  SUBSTANTIAL TENDENCY TO AFFECT MY IMPARTIALITY;

20       WITNESS MY HAND AND SEAL THIS 22ND DAY OF MAY,
    2023.
21

22

23                          _____
                                  NOTARY PUBLIC
24

25
```

